575 P.2d 1100 (1978)
Edwin J. WITZENBURGER, State Treasurer of the State of Wyoming, Appellant (Defendant below),
v.
STATE of Wyoming ex rel. WYOMING COMMUNITY DEVELOPMENT AUTHORITY, Appellee (Plaintiff below),
v.
STATE of Wyoming, Appellee (Intervenor below).
No. 4788.
Supreme Court of Wyoming.
February 13, 1978.
Rehearing Denied April 26, 1978.
*1103 Thomas S. Smith, Smith, Stanfield & Scott, Laramie, signed the brief and appeared in oral argument on behalf of appellant.
Dean W. Borthwick, Borthwick & McCall, Cheyenne, signed the brief and appeared in oral argument on behalf of appellee.
V. Frank Mendicino, Atty. Gen., and Steve F. Freudenthal, Asst. Atty. Gen., Cheyenne, signed the brief and V. Frank Mendicino, appeared in oral argument on behalf of appellee-intervenor.
Before GUTHRIE, C.J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.
Rehearing Denied April 26, 1978. See 577 P.2d 1386.
RAPER, Justice.
The Forty-third Wyoming State Legislature enacted the "Wyoming Community Development Authority Act," Chapter 188, Session Laws of Wyoming, 1975, appearing in the Wyoming Statutes as §§ 9-826 through 9-848, W.S. 1957, 1975 Cum.Supp.; in this opinion it will be referred to as "the Act." Its constitutionality has been challenged by the appellant-defendant, the State Treasurer, State of Wyoming. The district judge in an action for declaratory judgment brought by the appellee-plaintiff, the Wyoming Community Development Authority, reserved to this court 14 separate constitutional questions.[1]
*1104 The principal question is whether revenue bonds issued by the Wyoming Community Development Authority, for the payment of which excise tax revenue to be derived in future years is committed under the so-called "special" fund theory, come within the debt limit prohibitions of §§ 1 and 2, Article XVI, Wyoming Constitution:
"Sec. 1. The State of Wyoming shall not, in any manner, create any indebtedness exceeding one percentum on the assessed value of the taxable property in the state, as shown by the last general assessment for taxation, preceding; except to suppress insurrection or to provide for the public defense.
"Sec. 2. No debt in excess of the taxes for the current year, shall in any manner be created in the State of Wyoming, unless the proposition to create such debt shall have been submitted to a vote of the people and by them approved; except to suppress insurrection or to provide for the public defense."
We shall hold that such a pledge by a state agency and the legislature to pay off bonds issued for money borrowed by the Authority from revenues to be derived from excise taxes, in whole or in part, to be collected in the future is unconstitutional and explain why. The other constitutional questions reserved and questions raised on appeal will be discussed and decided to the extent necessary as they are reached in the opinion.
The Wyoming Community Development Authority Act is a complex piece of legislation, relating to the issuance of tax-free (§ 9-841) revenue bonds to finance public facilities of the state or any of its agencies, counties, municipalities or political subdivisions pronounced necessary by the legislature, due to the expansion of mineral activity within the state, causing impacted situations in various localities. The legislature declared its findings and purposes in enactment of the law in the language of § 9-827:
"It is hereby declared that there exists in this state by reason of the location and expansion of mineral extractive industries and other industrial developments, an acute shortage of adequate municipal, educational, recreational, cultural and other community facilities, and public services and municipally owned utilities, which conditions threaten and adversely affect the health, safety, morals and welfare of the people of this state. It is further declared that a critical shortage of adequate housing exists in the state because of the location and expansion of industries and industrial developments and the lack of funds of private mortgage lending institutions of the state which are available to finance new housing at reasonable rates. It is further declared that the rapidly expanding or expected population of the state cannot be provided with such needed facilities and services by conventional planning and financing sources. It is further declared that the provisions of this act [§§ 9-826  9-848] constitute a valid public purpose, of primary benefit to all citizens of the state of Wyoming." (Emphasis added.)
In order to carry out those purposes, the Wyoming Community Development Authority was created. It will be referred to in this opinion as the "Authority." It was declared to be "a body corporate and politic, constituting a political subdivision of the state operated solely for the public benefit." Its membership consists of 10 directors, appointed by the governor, with the advice and consent of the senate. The Authority is declared to be perpetual or until terminated by law, provided that in the latter case, there are no other bonds or other obligations of the Authority outstanding, unless provision be made for their payment. Section 9-829, W.S. 1957, 1975 Cum.Supp.
The Authority has extensive powers, including the right to sue or be sued, have a *1105 seal, execute contracts, make by-laws, contract with any person, municipality or state agency, purchase and hold property, as well as sell and transfer it, build civic projects or water projects, manage projects, provide advisory, consultative or educational services to anyone, public or private, lend money to municipalities and state agencies,[2] borrow money and issue its negotiable bonds and provide for the rights of the holders, mortgage or pledge any or all of its revenue or property, invest funds in all types of indebtedness, including the purchase of loans from mortgage lenders, residential real property, make loans to mortgage lenders and, finally, to do any and all things necessary or convenient to carry out the purposes and exercise the powers granted. A large portion of the Act is devoted to its power to issue its tax-free negotiable bonds, including a limitation on such issue to $100,000,000.00 outstanding at any time. Section 9-837.
By § 9-839, the legislature provided that debt service funds be established by the Authority to secure payment of outstanding bonds, as follows:
"(a) Prior to the delivery of each bond issue, the authority may create and establish one (1) or more debt service reserve funds and at such time or times as the authority determines, shall pay into such funds an amount not exceeding in the aggregate the maximum amount of principal and interest payable on the bonds thereby secured during any succeeding year, from:
"(i) Any proceeds of sale of bonds to the extent provided in the resolution of the authority authorizing the issuance thereof; and
"(ii) Any other moneys which may be received or made available to the authority for the purposes of such funds from any other source or sources.
"(b) The authority may also create and establish one (1) or more special reserve funds into which there shall be deposited from that portion of the moneys received by the state from the excise tax levied upon the privilege of extracting trona, coal, petroleum, natural gas, oil shale or other fossil fuel minerals which would be raised by an excise tax of one half (1/2) of one percent (1%) and which has not heretofore been pledged to any constitutional trust fund, an amount which does not exceed the maximum amount of principal and interest payable on the bonds thereby secured in any succeeding year.

"(c) The moneys held in or credited to any debt service or special reserve fund established under this section, except as hereinafter provided, shall be used solely for the payment of the principal of bonds of the authority secured by such reserve fund, as the same mature, or are redeemed prior to maturity, the purchase of such bonds of the authority, the payment of interest on such bonds of the authority or the payment of any redemption premium required to be paid when such bonds are redeemed prior to maturity. Prior to using any moneys in the debt service reserve fund the moneys, if any, deposited in the special reserve fund securing bonds shall be used for such purposes. Any moneys expended from a special reserve fund shall be replaced on a pro rata basis with any other such special reserve fund from the first excise tax proceeds thereafter received not required to be otherwise applied. The interest earned on the amount deposited in any reserve fund may be used for the purpose of defraying the cost of the authority's operations. After June 30, 1979, all interest earned on the amount deposited under the provisions of subsection (b) of this section shall be deposited in the State general fund. No money in any reserve fund *1106 may be withdrawn at any time such as would reduce the amount of such fund to less than the amount which is pledged in the proceedings authorizing the issuance of the bonds secured by the reserve fund, except for the purpose of paying principal and interest on such bonds maturing and becoming due, and for the payment of which other moneys of the authority are not available.
"(d) To assure the continued operation and solvency of the authority for carrying out the public purposes of this act [§§ 9-826 to 9-848], there may be appropriated, at the discretion of the legislature, and paid to the authority for deposit in each debt service reserve fund such sum, if any, as shall be certified by the chairman of the authority to the governor as necessary to restore such fund or funds to an amount equal to the maximum amount of principal and interest maturing and becoming due in the next succeeding year on the bonds of the authority then outstanding and secured by such fund or funds. The chairman of the authority shall annually, on or before August 31 in each year, make and deliver to the governor his certificate stating the sum, if any, required to restore each such fund to the amount aforesaid, and the sum or sums so certified, if any, may, at the discretion of the legislature, be appropriated and paid to the authority during the then current state fiscal year." (Laws 1975, ch. 188, § 1.)
(Emphasis added.)
By § 9-843, the legislature on behalf of the State of Wyoming made the following pledge:
"The state pledges to and agrees with the holders of any bonds issued under this act [§§ 9-826 to 9-848], that the state will not limit or alter the rights hereby vested in the authority to fulfill the terms of any agreements made with the holders thereof, or in any way impair the rights and remedies of such holders until such bonds together with the interest thereon, with interest on any unpaid installments of interest, and all costs and expenses in connection with any action or proceeding by or on behalf of such holders are fully met and discharged. The authority is authorized to include this pledge and agreement of the state in any agreement with the holders of such bonds."
There are various companion acts, designed to implement the activity of the Authority. Those acts take on great significance when we arrive at that point in this opinion where there is described what has been done by the Authority in its ongoing activity, since its creation. Its plans and programs thus far disclosed, as a part of the facts of this case, are ambitious, far-reaching, unique to this state and require close scrutiny because of the pertinent Wyoming constitutional inhibitions protecting the tax-paying public from the creation of public debt.
The first of the related acts is what is known as the Wyoming Joint Powers Act, §§ 9-18.13 through 9-18.20, W.S. 1957, 1975 Cum.Supp., authorizing counties, municipal corporations, school districts, community college districts or special districts to jointly plan, create, expand, finance and operate various public facilities under a power capable of being exercised by all those joined together. Under such a combination, a joint powers board is appointed by the governing bodies of the participating agencies.[3] Financing is through any funds available to the various agencies and by issuance of bonds, both general obligation and revenue bonds. It is under the authority of this Act that the Gillette-Campbell County joint powers board would qualify as an entity to which the Authority could make a loan and which we shall later consider in this opinion. The farm loan board is also authorized to make loans from permanent funds of Wyoming to joint powers boards. A joint powers board can thus borrow from the Authority and pledge loan money to the Authority *1107 as security for any loan from the latter.[4] The loan authority, however, is not exercised in any of the programs before us for consideration.
Intertwined with the extensive financing arrangements in which the Authority has been designated to act, is the imposition of a severance tax on coal by § 39-227.1, W.S. 1957, 1975 Cum.Supp., and the excise tax on various other minerals, including coal, by § 39-227.1:1, W.S. 1957, 1975 Cum.Supp., and its disposition. Section 39-227.10, W.S. 1957, 1975 Cum.Supp., provides that:
"(a) All revenue received and collected under the provisions of W.S. 39-227.1 through 39-227.11 shall be transferred to the state treasurer.
"(b) The constitutional portion of the revenue derived from the excise taxes on extraction of minerals levied by W.S. 39-227.1(a) shall be transferred by the state treasurer to the permanent Wyoming mineral trust fund and the balance of the excise tax levied in W.S. 39-227.1(a) and (b) transferred to the general fund.[5]
"(c) All revenue received under the provisions of W.S. 39-227.1(f)[6] shall be deposited in the Wyoming coal tax revenue account within the earmarked revenue fund. Any unexpended balance in the coal tax revenue account may be invested by the state treasurer and interest earned shall be credited to the Wyoming coal tax revenue account.
"(d) The monies in the Wyoming coal tax revenue account shall be administered by the Wyoming farm loan board and disbursed by the board for use in areas which are directly or indirectly impacted by the production of coal, to assist in financing public water, sewer, highway, road or street projects. Not less than sixty percent (60%) [in 1977, decreased to 50%, 1977 Interim Supp.] of the revenues to the coal tax revenue account shall be used to finance state highway, county road or city street projects.
"(e) For the purposes set forth in subsection (d) above, the Wyoming farm loan board may make grants, or may pledge or *1108 otherwise contract with, any county, city, town, sewer district, water district or other political subdivision of the state, or the state highway department, with respect to the use of the revenues derived or to be derived from the excise tax pursuant to W.S. 39-277.1(f). Any recipient of such revenues or a pledge of future revenues, may, with the approval of the Wyoming farm loan board, pledge wholly or in part, for the payment of any obligation to the Wyoming community development authority, or other obligee, the monies derived or to be derived from the excise tax, subject to any existing pledges or other contractual limitations theretofore imposed.
"(f) All applications for project assistance shall be made directly to the Wyoming farm loan board, in whatever form the board may prescribe. The board may submit any application to the state highway department, the department of economic planning and development or any other state agency for review and recommendation before approving or disapproving the application. Before any application is approved, the farm loan board shall determine by proper investigation:
"(i) That the applicant has fully utilized or will fully utilize all local revenue sources reasonably available for financing the project for which application is made;
"(ii) That such local revenue sources are insufficient to finance the project; and
"(iii) That the project applied for is necessary." (Emphasis added.)
As will develop during the course of this opinion, it is the use of excise tax money granted by the Wyoming farm loan board under authority of this section to liquidate bonds of the Authority over extended periods of years that creates a debt prohibited by the limitations of § 2, Article XVI, Wyoming Constitution.
An additional related act is the State Highway Commission Loan Act, § 24-125, W.S. 1957, 1975 Cum.Supp.,[7] authorizing the state highway commission to borrow money from the Authority, evidenced by a special obligation loan, payable from and secured by revenues received from the coal impact tax. The act specifically provides that any such special obligation loans "shall not constitute a debt nor an indebtedness within the meaning of any constitutional or statutory debt limitations." The proceeds of such a loan must be used for highway facilities necessary by reason of the location and expansion of mineral extractive industries and other industrial developments in the state.
Present proposed bond financing by the Authority includes the following highway and civic projects under the loan to municipality and state agency power, § 9-830(n),[8] requiring the sale of the Authority's revenue bonds in the amount of $4,880,000.00. The proceeds are to be used for the following purposes:
(1) A loan from the Authority to the Wyoming State Highway Commission in the principal amount of $2,500,000.00 for the purpose of financing the construction *1109 and reconstruction of that portion of a state highway designated as the Reno Junction-Clareton road project located in Campbell and Weston counties.
(2) A loan from the Authority to the City of Gillette in the principal amount of $350,000.00 for the purpose of financing the construction and installation of a sewer trunk line in the city.
(3) A loan from the Authority to the Gillette-Campbell County Joint Powers Board in the principal sum of $1,465,000.00 for the purpose of financing the construction and installation of a water storage facility, water transmission lines and booster pumps, together with necessary appurtenances.
(4) $90,000.00 to be deposited in a cost of issuance account; and
(5) $475,000.00 to be deposited in a debt service reserve account.
Under the provisions of the mortgage purchase power, § 9-830(u),[9] the Authority proposes to issue and sell revenue bonds in the principal amount of $570,000.00. These bond proceeds will be used for the following purposes:
(1) A mortgage loan purchase commitment with Provident Federal Savings and Loan Association of Casper, Wyoming, in the principal amount of $500,000.00;
(2) $60,000.00 in a debt service reserve account;
(3) $10,000.00 to be deposited in a cost of issuance account.
In addition to the foregoing, the Authority proposes to sell its revenue bonds in the principal amount of $215,000.00 under the loans to lenders power, § 9-830(v),[10] for the following purposes:
(1) A loan of $200,000.00 to the First National Bank of Glenrock, Glenrock, Wyoming;
(2) $4,500.00 to be deposited in a cost of issuance account; and
(3) $10,500.00 to be deposited in a debt service reserve account.
As a condition of financing, the Authority required the Gillette-Campbell County joint powers board, the City of Gillette and the Wyoming Highway Commission to apply to the Wyoming farm loan board for grants authorized by § 39-227.10(e), heretofore set out, providing generally that the Wyoming farm loan board may make grants, or may pledge or contract with any county, city, town, sewer district, water district or other political subdivision of the state, or the state highway department with respect to the use of revenues derived or to be derived from the excise tax, pursuant to § 39-227.10(f), also heretofore set out. The grants were made as follows:
(1) Gillette-Campbell County Joint Powers Board, $282,000.00 for water storage project. For debt service: (a) first year, $85,000.00; (b) second year, $57,000.00; (c) third year, $45,000.00; (d) fourth year, $63,000.00; (e) fifth year, $32,000.00.
(2) City of Gillette Donkey Creek sewer line project, total grant $621,250.00, not to exceed $31,000.00 per year for 20 years to cover a portion of the debt service for Donkey Creek sewer line project.
(3) Wyoming State Highway Commission, not to exceed $275,000.00 each year for 15 years, for debt service payments.
The farm loan board authorized each to pledge its grant to the Authority.
The loan and bond purchase agreements by the Authority with the Gillette-Campbell County joint powers board and the City of Gillette each provide that for payment of bonds, each "* * * pledges the net revenues *1110 specified * * *, including the revenues derived from a coal impact tax grant from the Farm Loan Board of the State of Wyoming. * * *" The loan agreement between the Authority and the Highway Commission for the special loan provides that:
"The Commission, for payment of the principal and interest on said note, hereby pledges the revenues derived from the coal impact tax grant from the Wyoming Farm Loan Board, a copy of the application for said grant, the documents evidencing the grant, and the assignment and pledge of the grant being attached * * *."
The Authority has entered into three selling agency agreements with the First Boston Corporation of New York City in which the latter, representing itself and other selling agents for an unspecified commission to be paid, agreed to use its best efforts to market the civic and water project, lenders and mortgage purchase tax-free revenue bonds in the amounts of $4,880,000.00, $215,000.00 and $570,000.00, respectively. The state treasurer-appellant declines to countersign the selling agency agreements or to certify that the bonds are issued pursuant to law and would not constitute an indebtedness of the State, as required by § 9-836(b).[11] This action for declaratory judgment was then initiated by the Authority.
It is important at this juncture that we determine what sort of an entity the legislature has really devised. The first two sentences of § 9-829(a) contain the legislative declaration that, "There is hereby created the Wyoming community development authority. The authority is a body corporate and politic, constituting a political subdivision of the state operated solely for the public benefit." (Emphasis added.) The district judge found, as a matter of statutory interpretation, that "The Authority is not an agency of the State of Wyoming but is a political subdivision of the state." We will hold that it is neither. It is not a political subdivision of the state because it lacks essential characteristics to make it so. The legislature, however, did not intend to create the Wyoming Community Development Authority to be a state agency because of the use of phraseology declaring it to be a body corporate and politic "constituting a political subdivision of the state", subject to constitutional provisions pertaining to that class of governmental entity. It will now have to make a determination as to whether it wishes to create a state agency. For the reasons which we shall set out, we are satisfied, in the absence of the legislature's expressed intent to the contrary, it did create an entity, having all the characteristics of a state agency. The label it bears is not conclusive.
The Wyoming Constitution contemplated that there be, within its four corners, state functions and functions performed by political subdivisions with separately prescribed controls regulating each. This court in all of its opinions pertaining to governmental financing and debt limitation has always dealt with the traditional political subdivision, such as cities, towns, counties, school districts, etc. It has never been called upon to consider statewide financing to carry on some state project having a public purpose, except as we shall note otherwise.
The whole act in its treatment contemplates and is oriented into a state activity. The legislative findings and purposes declare that conditions exist which "threaten and adversely affect the health, safety, *1111 morals and welfare of the people of this state." The closing legislative finding is that the provisions of the act are "of primary benefit to all citizens of the state of Wyoming." Section 9-827. The Authority is designated the "Wyoming community development authority." The directors are appointed by the governor, as head of the state, with the advice and consent of the state senate. Section 9-829(a). State agencies are authorized to loan by assignment state employees to the Authority to assist in carrying out its functions and duties under the act. Section 9-846(a). It must submit an annual report, just as required by § 9-21, W.S. 1957, 1975 Cum. Supp.,[12] of all state agencies. Section 9-847(a). The Authority is required to submit its budget for review, as provided by "W.S. 9-276.18:61 through 9-276.18:64 and 9-276.18:67 through 9-276.18:68,[13] and may request an appropriation, if necessary." Section 9-847. The various sections referred to are those applicable to state agencies.
An examination of the provisions of the Wyoming Constitution, Article XVI, pertaining to public indebtedness, with which we are in this case dealing primarily, indicates that the expression, "political subdivision" is used in §§ 6 (prohibiting loan of credit, donations and internal improvement, the latter only on vote of people); 7 (payments of public money only upon appropriation and certified claim); 8 (endorsements on bonds and evidences of indebtedness); 11 (construction and maintenance of airports). The constitution does not define a "political subdivision." Section 6 indicates that a county, city, township,[14] town and school district are political subdivisions, when it uses the language, "any county, city, township, town, school district, or any other political sub-division." (Emphasis added.)
In determining the meaning of the words "political subdivision," we must consider the probable intention of the framers *1112 of the constitution in adopting the constitutional provisions with which we are concerned. Certain-teed Products Corporation v. Comly, 1939, 54 Wyo. 79, 87 P.2d 21; Zancanelli v. Central Coal & Coke Co., 1918, 25 Wyo. 511, 173 P. 981. While the constitution of the State of Wyoming was fresh in the minds of its framers, a delegate[15] to the constitutional convention, State of Wyoming, shortly after its adoption in 1889, became a member of the Wyoming Supreme Court. Justice Charles N. Potter in Rasmussen v. Baker, 1897, 7 Wyo. 117, 50 P. 819, 38 L.R.A. 773, made down-to-earth observations with respect to the construction of the constitution and noted that the intent of the people adopting it is the vital part and spoke approvingly of judicial language enunciating the principle that the natural import of words is that which their utterance suggests to the mind  that which common use affixed to them. He went on to say that the language is to be understood in the sense in which it was used at the time when it was adopted.
Justice Potter quoted from Cooley on Constitutional Limitations:
"* * * A constitution is not to be made to mean one thing at one time, and another at some subsequent time, when the circumstances may have so changed as perhaps to make a different rule seem desirable. A principal share of the benefit expected from written constitutions would be lost if the rules they establish were so flexible as to bend to circumstances, or be modified by public opinion. It is with special reference to the varying moods of public opinion, and with the view to putting the fundamentals of government beyond their control, that these instruments are framed. `What a court is to do, therefore, is to declare the law as written, leaving it to the people themselves to make such changes as new circumstances may require.' Cooley, Const. Lim. 54, 55. So, the language of the constitution is to be understood in the sense in which it was used at the time when it was adopted. [Citing case.]"
With those concepts in hand, those who drafted the constitution had in mind a "political subdivision" to be something less than the entire State of Wyoming in using such examples as a county, city, town and school district. By In re West Highway Sanitary and Improvement District, 1957, 77 Wyo. 384, 317 P.2d 495, this court recognized the rule used in the construction of a constitution that general words, which follow particular words, are presumed to relate only to things of the same kind or class as particular words and the enumeration of specified things in a constitution usually is construed to exclude all other things not so enumerated. Thus In re West held that the indebtedness of a sanitary district was limited in the same manner as a municipality.
Applying those well known concepts of construction then, a "political subdivision" must be an entity of the same kind or class as a county, city, township, town or school district. It would stretch our credulity to be led to the conclusion that an activity embracing the entire state, answerable directly to the legislature, is a thing comparable to the type and class of "political subdivision" as conceived by the constitutional convention.
The conclusion we reach is consistent with other extensive precedent we have searched out to remove any doubt[16] that a political subdivision, as visualized by the legislature, is entirely different from a political subdivision, as envisioned by the authors of the Wyoming Constitution. We find the words have many times been defined by textwriters and the courts of this country. A political subdivision is a unit of local government, not state government, as we shall develop.
*1113 Webster defines political in the sense in which we are interested as "of or relating to government, a government, or the conduct of governmental affairs * * *." Webster defines subdivision in the sense in which we are concerned as "something produced by subdividing * * * a part made by subdividing * * *." To "subdivide" is "* * * to divide into several parts * * *." A subdivision is something less than the whole.
The courts in applying those word definitions state that a political subdivision of a state is a geographic or territorial subdivision of the state to which has been empowered certain local governmental functions within such a geographic area. Fair v. School Employees Retirement System of Ohio, 1975, 73 Ohio Op.2d 101, 44 Ohio App.2d 115, 335 N.E.2d 868. City of Norwalk v. Daniele, 1955, 143 Conn. 85, 119 A.2d 732, captures the same idea when it holds that the word "state" means a body of people occupying a definite territory and politically organized under one government. The subdivision of a state would be a body of people less in number in the state, politically organized and occupying a part of the territorial area of the state.
As analyzed by the court in Maryland-National Capital Park and Planning Commission v. Montgomery County, 1972, 267 Md. 82, 296 A.2d 692, political subdivisions embrace a certain territory and its inhabitants, organized for the public advantage to exercise governmental functions, the electors therein being to some extent committed the power of local government for the peculiar benefit of the people there residing. That case sets out many cases giving examples of what are and what are not political subdivisions. Running through the cases there cited is the concept that a political subdivision contemplates a prescribed geographical area with boundaries, public officers selected by its inhabitants through public elections, with authority for subordinate self-government, acting for the public purpose for which the area was organized. See also from the same jurisdiction, State v. Canova, 1976, 278 Md. 483, 365 A.2d 988.
Setting out the distinctive marks of a political subdivision and to the same general effect are Kansas City Area Transportation Authority v. Ashley, Mo. 1972, 478 S.W.2d 323; Housing Authority of City of Woonsocket v. Fetzik, 1972, 110 R.I. 26, 110 R.I. 912, 289 A.2d 658; City of Miami v. Lewis, Fla.App. 1958, 104 So.2d 70; Bolen v. Board of Firemen, Policemen and Fire Alarm Operators' Trustees of San Antonio, Texas, Tex.Civ.App. 1957, 308 S.W.2d 904; Arkansas State Highway Commission v. Clayton, 1956, 226 Ark. 712, 292 S.W.2d 77; Allison v. Corker, 1902, 67 N.J.L. 596, 52 A. 362, 60 L.R.A. 564.
Idaho has a constitutional provision similar to the one we are considering, providing:
"No county, city, town, township, board of education, or school district, or other subdivision of the state, shall incur any indebtedness, or liability, in any manner, or for any purpose, * * *." [Const. art. 8, § 3]
In Lloyd v. Twin Falls Housing Authority, 1941, 62 Idaho 592, 113 P.2d 1102, it was decided that under that provision the Housing Authority was not a political subdivision because there was no provision for electors or elections, nor for the assessment of an annual tax, apparently referring to the attributes of a county, city, town, township, board of education or school district. See also in a similar vein, State ex rel. Miller v. State Board of Education, 1935, 56 Idaho 210, 52 P.2d 141.
The constitutional examples of counties, towns and school districts are ones that have the distinctive badges of a political subdivision. Each has a geographic area smaller than the state, each is organized with officers elected by its inhabitants to carry on a governmental function, having a local purpose and provision is made for the levy and assessment of taxes to finance those purposes. The Authority here created by the legislature has none of those characteristics. A mere declaration by the legislature that the thing it has created is a political subdivision does not make it so nor *1114 is the legislative declaration binding upon this court.
While it is our duty to give great deference to legislative pronouncements and uphold constitutionality when possible, it is likewise our equally imperative duty to declare a legislative enactment invalid if it transgresses the state constitution. We cannot, in good conscience, call the Authority a political subdivision when it is clear by the terms of the act itself that it is not. We must look behind the name to the thing named. Its character, its relations and its functions determine its position, not the sobriquet it carries.
We understand the importance to the legislature that the thing it has brought into being pass as a political subdivision. This court down through the years has decided cases approving various techniques employed by political subdivisions to constitutionally remain within the debt limitations imposed by Article XVI, Wyoming Constitution, but it must be realized that they did pertain to political subdivisions. The Authority and the State of Wyoming rely upon them in this case.
We should note in passing from the question just covered that if the Authority were to be considered a political subdivision, the debt ceiling would be increased from one percent to four percent on the assessed value of property in the State of Wyoming. The State's debt limit is one percent under the provisions of § 1, Article XVI, Wyoming Constitution. The debt limit for a political subdivision is four percent under the provisions of § 3, Article XVI, Wyoming Constitution. This may or may not have been a legislative incentive in its plan to create a political subdivision.
In itself, the fact that the legislature has created something other than a political subdivision is meaningless. To raise that holding to constitutional proportions, it must be connected to controlling constitutional provisions and its importance more fully explained.
As can be readily ascertained, we could very easily hold that the legislature has fashioned a state agency, not a political subdivision; or that it has fashioned a separate body corporate, as a state instrumentality, but not a political subdivision. It is clear that the legislature did not intend that to be the case because it thought it was and wanted it to be a political subdivision.
In order to develop the relevance of our holding on this point, we must conclude that an agency or separate body corporate, as an instrumentality of the state, was devised in fact; and when we conclude, the legislature may still wish to retain the Authority but under the constitutional restrictions pertaining to the state. We do not hold that the legislature cannot create a state agency or a separate body corporate as a state instrumentality to carry on public work. Subject to constitutional restraints, the legislature may create bodies corporate to carry out powers it deems necessary. War Memorial Hospital of District No. 1, Park County v. Board of County Commissioners of County of Park, 1955, 73 Wyo. 371, 279 P.2d 472. We do not hold that the legislature cannot create a political subdivision but if it does, it must have those attributes of a political subdivision, within the contemplation of the Wyoming Constitution, such as we have outlined.
Since the organization put together by the legislature is not a political subdivision, §§ 1 and 2 of Article XVI become applicable. We repeat them to be:
"Section 1. The State of Wyoming shall not in any manner, create any indebtedness exceeding one per centum on the assessed value of the taxable property in the state, as shown by the last general assessment for taxation, preceding; except to suppress insurrection or to provide for the public defense.
"Section 2. No debt in excess of the taxes for the current year, shall in any manner be created in the State of Wyoming, *1115 unless the proposition to create such debt shall have been submitted to a vote of the people and by them approved; except to suppress insurrection or to provide for the public defense."
Those provisions have never before been construed by this court, other than in Arnold v. Bond, infra, with regard to the University of Wyoming, since the history of the State indicates it has never before placed its obligations, either general or revenue, into the securities market, by way of a public offering, at least with court approval.
Provisions such as those constitutional limitations we shall now consider have a background founded on what was regarded as "rash and irresponsible borrowing by states in the Nineteenth Century." In the 1830s states were urged to borrow and invest in profit-producing capital enterprises. Profits were expected to exceed interest. A depression in the period, in 1837, turned the investments into losses and the burden of debt service became crushing, causing some states to default. New constitutional amendments, limiting the total of state debt, rose out of the experience.
In the 1850s the newly-admitted states of the west splurged on railroad investment and the underwriting of railroad construction. Again, contrition led to states, by constitutional amendment, forbidding their legislatures from borrowing except under sharp limitations in amount or requiring voter ratification. Wyoming's constitution includes those safeguards of the public's interests.[17]
T.A. Larson, History of Wyoming, pp. 246-247, describes how the 1890 Wyoming Constitution was the product of heavy borrowing from the constitutions of other states, already in the Union. A committee of the constitutional convention in an address to the people of Wyoming in 1889, urging adoption of the Constitution, said: "The restrictions upon taxation and the creation of public debts are such as to necessitate economy in public affairs and insure to the people the highest excellence in government for the least money."[18]
The Wyoming Community Development Authority Act and the other legislation, companion to it, launches the state on a bold course of public financing, drawing heavily on the name of the State of Wyoming, subtly suggesting bonds are backed by an "obligation" of the State and in the case of grants by the farm loan board, there is explicit, less subtle, authority to make grants "* * * of the revenues derived or to be derived from the excise tax levied" (Emphasis added) pursuant to § 39-227.10(e), W.S. 1957, 1975 Cum.Supp. Those grants (moneys derived or to be derived from the excise tax), of course, may by the same § 39-227.10(e) be pledged "for the payment of any obligation to the Wyoming community development authority, or other obligee, * * *." By circuitous routing, tax money becomes funds committed to secure and liquidate over a period of years bonds sold to the public. The Authority and the attorney general for the State of Wyoming have drawn on various technical rules, derived from political subdivision cases which have no application to the problem of state indebtedness now before us.
We have little question but what the state legislature could create a body corporate separate and distinct from that of the state as asserted by the Authority and create obligations that are not those of the state. The Authority cites Arnold v. Bond, 1934, 47 Wyo. 236, 34 P.2d 28, in support of its position that the Authority has the same status in this case as the University of *1116 Wyoming had in that case. The Authority does not have the same standing. There, the legislature authorized commitment of income from permanent land funds to pay off, by installments, a loan from the United States of America to cover the cost of construction of a liberal arts building. The court stated that there is no constitutional violation of §§ 1 and 2, Article XVI, if liability is limited so as not to be a charge on the taxpayers of the state.
In Arnold, it was pointed out that the funds to be utilized had their source from the income arising out of 72 sections of land granted by the Act of Admission to Wyoming, for the use and support of the University. By § 1, Article XVIII, Wyoming Constitution,[19] all lands were accepted subject to the purposes intended by Congress. By § 15, Article VII, Wyoming Constitution,[20] lands granted to the State by the United States were specifically set aside for university purposes. Additionally, § 17, Article VII, specifically provided for appointment of a board of trustees "for the management of the university, its lands and other property." The whole authority for the indebtedness not only had its roots in the Wyoming Constitution, but in the Act of Admission as well.
The court in Arnold clearly distinguished the situation present here. The court referred specifically to those debts as unconstitutional where if income from land grants were insufficient, the remainder should be paid out of the tax money of the State. 47 Wyo. at 248, 34 P.2d at 31. The court made it clear that "* * * if the proposed loan were of such amount that as a result of it the legislature would practically be compelled to make up the payments under the loan by taxation in order that the university might be able to function as such in a reasonable way, a different question would arise, * * *." The court then warned that the opinion must not be construed as permitting the state to pledge a special fund for repayment of a loan. 47 Wyo. at 252, 34 P.2d at 33.
The Authority cites to us Uhls v. State ex rel. City of Cheyenne, Wyo. 1967, 429 P.2d 74,[21] as authority for the proposition that the indication on the face of the bonds that they are not debts of the state, as provided *1117 by § 9-836(b),[22] establishes that they therefore are not debts of the state. This court in that case, its companion case, Reed v. City of Cheyenne, supra, and a later case, Powers v. City of Cheyenne, supra, also cited by the Authority, was considering the constitutionality of the Industrial Development Projects Act, §§ 15.1-92, et seq., W.S. 1957, C. 1965. That Act cannot be compared with the one before us now because it was made absolutely clear that only the revenues of the project would be responsible for payment of the revenue bonds and tax revenues and the taxing powers of the City would not under any circumstances be subjected to appropriation to satisfy the indebtedness. That Act does not have the same tax implications and manipulation of public tax money which are found so openly referred to and relied upon to back up and pay off the proposed bonds as we see in the Act before us.
We are not bound by the legislative self-serving declaration that the bonds are not debts of the state if, in fact, such declarations and required certificates do not represent conditions that actually exist. The declaration of the Act is without effect, when it is clear from the legislation itself and those acts companion to it, a debt of the State is created. That would be approval of a nonexistent fact. We must look to the substance, not the form. Whether a statute authorizes a debt of the State contrary to constitutional curbs is a judicial question, rather than a legislative question. Laverents v. City of Cheyenne, 1950, supra; State ex rel. Hall v. Taylor, 1970, 154 W. Va. 659, 178 S.E.2d 48; People ex rel. City of Chicago v. Barrett, 1940, 373 Ill. 393, 26 N.E.2d 478; State Office Bldg. Commission v. Trujillo, 1941, 46 N.M. 29, 120 P.2d 434; Boswell v. State, 1937, 181 Okl. 435, 74 P.2d 940. The notice on the bonds does not preclude a finding that as a matter of fact and as a matter of legislative fiat, future tax money is offered as security for and payment of revenue bonds, though reached in a round-about way: taxpayer to state treasury, to farm loan board, to county, city, town, sewer district, political subdivision[23] or highway department, to Authority. The legislature cannot do indirectly what it cannot do directly. Our constitutional provisions, §§ 1 and 2, Article XVI, are explicit in their checks that the prohibited indebtedness not be created "in any manner."
We cannot compare Laverents v. City of Cheyenne, supra, to the problem before us but some of its well-thought-out principles, pertaining to public indebtedness and its constitutional limitations are applicable. In the first place, it involves the true type of political subdivision, contemplated by Article XVI, Wyoming Constitution, a city. In the second place, it utilizes the apparatus of a traditional and proper "special fund," not one of the extraordinary sort, put together by the Act for use of the Authority, placing great dependence on the taxing power of the State.
This court in Laverents defined a special fund as reflected from other authority to be one in which the facility to be built or purchased is to be paid for wholly out of the income and revenue from the property so acquired without any other liability on the *1118 part of the public body. The creation of such a fund from such revenues for payment of bonds does not give rise to an indebtedness within the meaning of a constitutional limitation. The Laverents court especially distinguished cases, such as we have here before us, where the fund is partially fed by a tax. When nourished by general tax revenues, the special-fund doctrine becomes subject to constitutional limitations which inhibit its utility. See also Frank v. City of Cody, supra. There can be no constitutional violation when a project is selfsustaining, without the aid of taxes.
We have a great affinity toward the views of the Montana supreme court in State ex rel. Ward v. Anderson, 1971, 158 Mont. 279, 491 P.2d 868, because it is so expressive of what this court decided in Laverents v. City of Cheyenne, supra, with respect to the special-fund doctrine. The Montana court had before it legislative bills; one authorizing, without a general election, the issuance of bonds to finance a building program without a general election, obligating 11% of the State's income and corporation license tax collections to their repayment, and another authorizing, without a general election, the sale of bonds for a state highway commission headquarters and complex, to be repaid from a fund made up of the net proceeds from the license tax imposed on gasoline distributors.
The court then quoted at great length, with approval, from an earlier Montana case, State ex rel. Diederichs v. State Highway Commission, 1931, 89 Mont. 205, 296 P. 1033, holding that any state indebtedness to be repaid from any constitutional method of raising revenue is a debt or liability requiring approval by the people. That court pointed out that because of the tendency of governments to run into debt, imposing additional burdens upon the taxpaying public, constitutional framers placed positive limitations upon the legislature to incur a debt. It was also there explained that when the State is obligated not to reduce excise taxes on motor fuels fixed by the legislature and cause them to be collected and paid to bondholders, under the plain terms of the constitution, there must be approval by the people.
It was asserted in Diederichs that the creation of a special fund has some magic and thereby laid aside the necessity for constitutional compliance. In that regard, the court said:
"Under this contention the Legislature, or the debt-contracting authority, could divide the public revenue into numerous subdivisions, calling one the `road fund,' another the `school fund,' another the `agricultural fund,' another the `public health fund,' and others almost without limit. Debts could then be contracted in unlimited amounts and payable in the far distant future, and still be immune from attack as violating constitutional provisions limiting indebtedness provided each debt was made payable out of some one of the specially designated funds into which all of the revenue collected by taxation from the people had been divided. A mere statement of the proposition carries with it, it seems to us, its own refutation. Crick v. Rash, 190 Ky. 820, 229 S.W. 63."
The Diederichs court explained excise tax funds to be state funds derived from one of the methods of raising public revenues. The creation of an obligation into the far future diverts funds which might otherwise be used to defray governmental expense, relieving the heavy burden of taxes on property. If allowed, all of the various kinds of taxes, if placed in a special fund, could be applied to large debts and thus accomplish by indirection what the constitution prohibits to be done directly. The people have a grave concern as to how and the purposes for which their money is spent.
The proceedings before us relating to proposed bond issues include "Loan and Bond Purchase Agreements" made between the Authority and the City of Gillette (for sewer facilities), the Gillette-Campbell County *1119 joint powers board (for water facilities) and the Wyoming State Highway Commission (for a highway). Each of the resolutions for sewer and water facilities contains provisions for administration of an income fund. The income funds are created from and arise out of revenues of the operations of the respective facilities. After providing first for payment of operation and maintenance expenses, remaining moneys go into an "Interest and Bond Retirement Fund." Also, there go into that retirement fund annually moneys "* * * necessary * * * legally available therefor from whatever source, (including, without limitation, coal impact tax grant payments) to pay the next maturing installment on the bond then outstanding * * *." (Emphasis added.) Any funds excess to the retirement go into a "Reserve Fund" to meet possible deficiencies in the "Bond and Interest Retirement Fund."
Throughout the treatment of the funds, the coal impact tax grant payments are considered as part of the income of the sewer and water facilities on the same level as revenues from actual operation of the systems. Those moneys are intermingled and not kept separate. No procedure is provided for the grant (tax) funds finding their way back to the State's general fund.
In the loan agreement between the Authority and the Wyoming State Highway Commission, included in the Authority "proceedings," it is indicated that the Commission has, pursuant to §§ 39-227.1 to 39-227.10, received a "coal impact tax grant for a period of fifteen years." The grant is in the amount of not to exceed $275,000.00 each year. That would total over a period of 15 years: $4,125,000.00 to pay off a two and one-half million dollar debt. The road proposed for construction is not to be a toll road, having any income, that would make it self-liquidating. The loan would depend solely upon tax revenues over a long, future period of years, through the grant, for repayment or by some further appropriation by the legislature.
Ergo, future taxes levied by the State become obligated for the payment of debts, because the payments on the loans from the Authority come from that source, and are, in turn, used to pay the holders of bonds, evidences of debt, issued by the Authority. Because of their routing, the grants never lose their identity as taxes. As a matter of fact, the grant money can be paid directly to the Authority under the provisions of § 9-834(b), providing that: "Any state agency shall, at the request of the authority, withhold from any municipality and pay directly to the authority any moneys in its possession which are pledged as herein provided."
To top that, the legislature makes, by § 9-843, the following guarantee to the holders of bonds issued by the Authority:
"The state pledges to and agrees with the holders of any bonds issued under this act [§§ 9-826 to 9-848], that the state will not limit or alter the rights hereby vested in the authority to fulfill the terms of any agreements made with the holders thereof, or in any way impair the rights and remedies of such holders until such bonds together with the interest thereon, with interest on any unpaid installments of interest, and all costs and expenses in connection with any action or proceeding by or on behalf of such holders are fully met and discharged. The authority is authorized to include this pledge and agreement of the state in any agreement with the holders of such bonds."
By this clear commitment, the legislature has obligated itself for the State that the legislature will not in any way alter or amend § 39-227.10(d) and (e), which authorizes the farm loan board to make grants of "revenues derived or to be derived from the excise tax levied" and authorizing the recipient of such "revenues or a pledge of future revenues * * * [to] pledge wholly or in part, for the payment of any obligation to the Wyoming community development authority, or any other obligee, the monies derived or to be derived from the excise *1120 tax, * * *." (Emphasis added.) The State thus placed its faith and credit on the line, and is irreversibly committed to a long-time discharge of debt, and future legislatures cannot repeal the tax or divert it to other purposes, once granted by the farm loan board. The attorney general has conceded that to be the case.
We are unable to visualize a more clear effort by the legislature to create a state "debt in excess of the taxes for the current year," without having put the proposition "to a vote of the people and by them approved," in violation of the express prohibition of § 2, Article XVI. For the state treasurer to certify that the bonds issued by the Authority are not a debt of the State would be a gross misrepresentation.
There is, we hold, a primary and direct liability to furnish future coal excise tax money to pay the bonds, in whole or in part. We are dealing with a cardinal obligation the legislature has conceived. We are not, at this juncture, considering the danger of § 9-839(d), imposing a moral obligation upon future legislatures. We shall discuss that section in a different context, dealing with the pressures of moral obligation, later in this opinion. At this point, we are wending our way back through the labyrinth of the Act and related legislation. Its intricate passageways take us to the unvarnished source  coal excise tax money granted to but going from political subdivisions and the highway department directly into Authority funds primarily liable to meet its bond obligations.
We must now turn to a consideration of the special reserve fund, utilizing excise tax money for payment of bonds issued by the Authority. By § 9-839(b), the legislature also pledges its full faith and credit to the payment of the bonds to the extent therein provided. That subsection reads as follows:
"(b) The authority may also create and establish one (1) or more special reserve funds into which there shall be deposited from that portion of the moneys received by the state from the excise tax levied upon the privilege of extracting trona, coal, petroleum, natural gas, oil shale or other fossil fuel minerals which would be raised by an excise tax of one half (1/2) of one percent (1%) and which has not heretofore been pledged to any constitutional trust fund, an amount which does not exceed the maximum amount of principal and interest payable on the bonds thereby secured in any succeeding year."
The money for that special reserve fund comes from the excise tax levied by § 39-227.1:1(c) which, in pertinent part, provides:
"(c) In addition to the excise tax provided for in subsection (b) of this section, there is hereby levied upon the privilege of extracting trona, coal, petroleum, natural gas, oil shale or any other fossil fuel minerals, an excise tax of two percent (2%) of the value of the gross product extracted. The proceeds from the tax are payable to the department of revenue and taxation and shall be deposited in the general fund. * * *"
The order of payment is prescribed by § 9-839(c) as follows:
"(c) The moneys held in or credited to any debt service or special reserve fund established under this section, except as hereinafter provided, shall be used solely for the payment of the principal of bonds of the authority secured by such reserve fund, as the same mature, or are redeemed prior to maturity, the purchase of such bonds of the authority, the payment of interest on such bonds of the authority or the payment of any redemption premium required to be paid when such bonds are redeemed prior to maturity. Prior to using any moneys in the debt service fund the moneys, if any, deposited in the special reserve fund securing bonds shall be used for such purposes. Any moneys expended from a special reserve fund shall be replaced on a pro rata basis with any other such special reserve fund from the first excise tax proceeds thereafter received not required to be otherwise applied. The interest earned on the amount deposited in any reserve fund may be *1121 used for the purpose of defraying the cost of the authority's operations. After June 30, 1979, all interest earned on the amount deposited under the provisions of subsection (b) of this section shall be deposited in the state general fund. No money in any reserve fund may be withdrawn at any time such as would reduce the amount of such fund to less than the amount which is pledged in the proceedings authorizing the issuance of the bonds secured by the reserve fund, except for the purpose of paying principal and interest on such bonds maturing and becoming due, and for the payment of which other moneys of the authority are not available." (Emphasis added.)
In summary, then, § 9-839(c) provides that bonds will be paid off from reserve funds in the following order: Before using funds from the debt service revenue fund under the provisions of § 9-839(a)(ii), the Authority first uses excise tax money provided for by § 9-839(b). That sequence of payment is provided specially by the following sentence in § 9-839(c):
"* * * Prior to using any moneys in the debt service reserve fund the moneys, if any, deposited in the special reserve fund securing bonds shall be used for such purposes. * * *"
As we understand the progression of discharge of bonded indebtedness from funds available to the Authority, payment by the Authority will be as follows: First, from REVENUES OF PROJECTS supplemented in the case of certain civic projects by COAL IMPACT TAX GRANTS; second, if the above is not sufficient, proceeds of the mineral excise tax in the SPECIAL RESERVE FUND are used; third, if the above is not sufficient, certain proceeds of the bond issue in the DEBT SERVICE RESERVE FUND are used;[24] fourth, if none of the above is sufficient, the legislature may replenish the debt service through the MORAL OBLIGATION PROVISION.
The special reserve fund made up of mineral excise tax money forms a part of the total resources of the Authority to meet its bonded obligations. Because the Wyoming legislature has historically not kept, as far as we know, a verbatim record of all its proceedings, either on the floor or in committee, we do not have the advantage of much legislative background for its enactments. However, in this instance, we find included in the record an Interim Report and Recommendations of a Legislative Select Committee, by which it recommended passage of the Act. The Legislative Select Committee in its Interim Report explains the intent of that section to be a continuing obligation of the State, as long as there are bonds outstanding, to keep that reserve fund at full strength.[25] We read it to that extent in the same manner.
*1122 We then find the funds set up for discharge of bond obligations, not only in the revenue account, but also the special reserve fund, to contain tax money to be collected in future years. We consider both uses to be prohibited and not within the special-fund doctrine, as we have defined it. Arnold v. Bond, supra; Laverents v. City of Cheyenne, supra. Both cases hold that a special fund cannot be fed by taxes. They spoke prophetically and their prophecy has come to pass in the case before us.
We find in State v. Martin, 1963, 62 Wash.2d 645, 384 P.2d 833,[26] an expressive summary of the declarations of Arnold and Laverents and we adopt it as the law of this jurisdiction with respect to the special-fund doctrine, pertaining to any indebtedness created as to the State of Wyoming:
"That the special fund doctrine is a useful and valid tool of government is apparent when one thinks of all of the institutions and devices of government supported by it. But the true test of its application here is not what comes out of the fund, but what goes into it. If the revenues in it derive exclusively from the operation of the device or organ of government financed by the fund, as in the case of a toll bridge, * * * any securities issued solely upon the credit of the fund are not debts of the state, but debts of the fund only. But if the state undertakes or agrees to provide any part of the fund from any general tax, be it excise or ad valorem, then securities issued upon the credit of the fund are likewise issued upon the credit of the state and are in truth debts of the state."[27]
The only way to conform to the prohibitions of §§ 1 and 2, Article XVI, is to stay within their clear limits without an election or submit the debt proposition to a vote of the people for approval. To hold otherwise would be to unlock the doors and grant the legislature unbridled authority to create debt without limitation, contrary to what the State's founding fathers, with approval of the people, conceived to be reasonable restraints.
The Authority and attorney general place their principal reliance on Banner v. City of Laramie, 1955, 74 Wyo. 429, 289 P.2d 922. It is distinguishable and not in point for several reasons, probably the most important of which is that it involved local financing by a political subdivision and made no reference to or explanation of §§ 1 and 2, Article XVI, pertaining to prohibitions against State indebtedness. In Banner, tax moneys used to feed the special fund had two sources.
The taxes relating to the operation or use of vehicles on public highways, streets or alleys or to fuels used for propelling such vehicles were dedicated to the payment of highway obligations, costs for construction, reconstruction, maintenance and repair of public highways, county roads, bridges, and streets, alleys and bridges in cities and towns, and expense of enforcing state traffic laws, by § 16, Article XV, Wyoming Constitution. As far as the gasoline taxes were concerned, the principle in Banner *1123 would follow the reasoning in Arnold v. Bond, supra, relating to the dedication of income from granted lands for educational purposes, also with constitutional roots. The Banner project was for storm sewers, part of street construction.
The cigarette taxes that went into the special city funds had their source in what is now §§ 39-161, et seq., the state cigarette tax act, § 39-172, in particular, by which the State distributed such taxes collected to cities, towns and counties. The levy of that excise tax was preempted by the State by § 39-175. The act creating the excise tax on cigarettes was not by the terms of any related act frozen by the State or any political subdivision. The State, by the cigarette tax act, was left at liberty to repeal, reduce the tax or divert it to any purpose that the legislature might desire.
However, the legislature by Chapter 155, p. 190, S.L. of Wyo., 1953, authorized cities and towns to create revolving improvement funds to guarantee payments of bond obligations for such projects and to place in such funds two percent of the cost, state gasoline or cigarette taxes, present and future, received by the City for a period of ten years.
The constitutionality of the revolving fund act was challenged as to §§ 4 and 5, Article XVI, Wyoming Constitution, pertaining to the debt limitation of cities and towns. No constitutional issue was raised or considered that it may have created a debt in the State in violation of § 2, Article XVI, Wyoming Constitution. The State or a state agency or state body corporate was not party to the action, nor was the State represented in any position. This court has never before considered or had presented for decision the issues as they are now before us. The State and its interests are now here before the court and represented by the attorney general.
We fail to find merit in the position of the Authority that § 2, Article XVI, Wyoming Constitution, in its prohibitions relates only to an ad valorem tax. Sections 1 and 2 are separate, though related. "[T]he assessed value of the taxable property in the state, * * *" referred to in § 1, is there mentioned only as a limit on the amount of total authorized indebtedness the State may incur, if it wishes to become a debtor over and above normal, operating expenses by obtaining voter approval of any debt in excess of taxes for the current year. Section 2, on the other hand, does not in any way limit "taxes" to any particular type and we construe the word to mean taxes of every type.
This court has never construed those sections, in the light in which we must here consider them, of a State indebtedness because no legislature in the history of the State has ever seen fit to burden the taxpayers with debt, either with or without their consent by popular election, but has preferred to remain on a "pay as you go" basis. Arnold v. Bond, supra, however, makes a key declaration, which we confirm, when it says that a debt is unconstitutional when, if income from an authorized source is insufficient, the remainder must be paid out of tax money of the State. A debt, as there contemplated, would be created by the bonds that are proposed to be issued here.
Other than Arnold v. Bond, supra, the only cases this court has had before it were those relating to the bonding transactions of political subdivisions  creatures of the State. We have here held that the Authority is not a political subdivision. It may be a state body corporate of some sort or a state agency. We have only decided that it is not a political subdivision within the structure of the Wyoming Constitution and the declaration of the legislature that it is such an entity is without force and effect. There may be some overlap of constitutional philosophy and concepts with respect to the two types of government, state and local, but for the purposes of taxation, we hold them to be separate and distinct, involving different considerations. We have no intent in this case of upsetting established case law, as it pertains to political subdivisions and bodies politic, wherein this court has spoken. The taxing power of the *1124 State, as a sovereign, is practically without limit.
The taxing power of political subdivisions, on the other hand, is narrowly drawn, not only by the State Constitution but also by the legislature, having only those limited powers of taxation authorized by the legislature. As expressed in 16 McQuillin, Municipal Corporations (3d. Ed.), § 44.05, p. 13:
"One of the most essential powers of government is the right to raise revenue and no government can maintain itself without such power. The power to tax inheres in the state as an attribute of its sovereignty, and is not dependent upon a grant of power in the constitution. Constitutional provisions relating to taxation are not grants of power, but limitations upon the exercise of a power necessarily possessed by every sovereign state. Except as restricted by such provisions, the power of the state to tax is unlimited. Unless it has been delegated, the taxing power is vested in the state legislative department.
"Municipal corporations have no inherent power of taxation. On the contrary, municipal corporations possess with respect to taxation only such power as has been granted to them by the constitution or the statutes. This is true particularly with reference to those political subdivisions of the state which do not have full municipal status but which are constituted for special purposes and with limited powers and functions. It has been frequently stated that, as the power to tax is a governmental function, exercise thereof by a municipal corporation must rest upon a constitutional or statutory grant of power clearly expressed. A grant of power of taxation to municipalities is not without limitation or restriction. Grants are usually so construed. * * *" (Footnotes omitted.)
Those expressions of McQuillin are borne out within the past utterances of this court and the language of the Wyoming Constitution. A state constitution is not a grant but a limitation on legislative power, so that the legislature may enact any law not expressly or inferentially prohibited by the Constitution of the State. Bulova Watch Company v. Zale Jewelry Company of Cheyenne, Wyo. 1962, 371 P.2d 409; Brown v. Clark, 1934, 47 Wyo. 216, 34 P.2d 17; Spriggs v. Clark, 1932, 45 Wyo. 62, 14 P.2d 667, 83 A.L.R. 1364; State ex rel. Budge v. Snyder, 1923, 30 Wyo. 287, 219 P. 735, on rehearing, 1924, 31 Wyo. 333, 225 P. 1102; Harkin v. Board of Com'rs of Niobrara County, 1924, 30 Wyo. 455, 222 P. 35; Constitutional Law, Wyoming Digest.
This court most recently discussed the powers of local government in Schoeller v. Board of County Commissioners of County of Park, Wyo. 1977, 568 P.2d 869. The restricted powers of political subdivisions, particularly counties and municipalities are there discussed, with the conclusion that such entities have no inherent powers but only those specially delegated to them by legislative action. Municipalities, in their right to tax, are tightly hemmed in by § 3, Article XIII, Wyoming Constitution:
"The legislature shall restrict the powers of such corporations [municipal] to levy taxes and assessments, to borrow money and contract debts so as to prevent the abuse of such power, and no tax or assessment shall be levied or collected or debts contracted by municipal corporations except in pursuance of law for public purposes specified by law." (Bracketed word added.)
Because of the unlimited power of the sovereign state, it is only reasonable that § 2 be viewed under the light of all taxes. To do that, we should look at the origin of tax revenue for State operations. Pursuant to § 4, Article XV, Wyoming Constitution, for state revenue there may be levied annually a tax not to exceed four mills on the assessed valuation. What has happened? Between 1944 and 1949, the State's mill levy was 2.0 mills; between 1950 and 1957, 1.5 mills; between 1958 and 1966, 1.0 mills; 1967, 2.5 mills; 1968, 2.0 mills; 1969 1.5 mills, 1970 through 1976, no mills.[28] The *1125 State's operations then were financed entirely from other taxes for the past several years. What was the origin of those taxes? 1975-1976 State tax sources were as follows:
[29]
They were distributed with 46.3% going into the State's general fund as follows:

*1126 In the case of political subdivisions, governmental existence is dependent upon the ad valorem tax. In the State of Wyoming, in 1976, ad valorem taxes for local government were levied as follows: county taxes, $28,578,062.00; special district taxes, $4,208,939.00; school taxes, $119,694,563.00; municipal taxes, $4,199,200.00, for a total of $156,680,764.00.[30]
Wyoming is fortunate, in addition, to be the beneficiary of substantial land grants, the trust income from which goes to defray governmental expenses, which would ordinarily have to be borne by taxes: Sections 16 and 36 in every township for schools, § 2, Article VII, Wyoming Constitution, § 4, Act of Admission, 26 Statutes at Large 222, Ch. 664, 1 W.S. 1957, pp. 43-50; 72 sections, University of Wyoming, § 15, Article VII, Wyoming Constitution, § 8, Act of Admission; 50 sections, public buildings, § 6, Act of Admission; 75,000 more acres for public buildings, § 11, Act of Admission; 30,000 acres, penitentiary, §§ 9 and 11, Act of Admission; 90,000 acres of land for an agricultural college, § 10, Act of Admission; 30,000 acres for a state hospital, 5,000 acres for a fish hatchery; 30,000 acres for the deaf, dumb and blind; 10,000 acres for a poor farm, 30,000 acres for a hospital for disabled miners, 260,000 acres for state charitable, educational, penal and reformatory institutions, all granted by § 11, Act of Admission. A total of 500,000 acres of land were granted to the State by § 11 alone, Act of Admission.
The State of Wyoming as a unit of government is therefore in an entirely different status, with exceptional resources, that the several types of local government lack. It would seem inconceivable to us that the State of Wyoming could, by the simple expedient of not levying an ad valorem tax, remove the restrictions of § 2, Article XVI, and transform the section into a nullity.
The often-quoted definition is that, "Taxes are the enforced proportional contributions from persons and property, levied by the state by virtue of its sovereignty for the support of government and all public needs." 1 Cooley, The Law of Taxation, 4th Ed., § 1, p. 61. It is the citizen's share he or she pays for the general expense of government, in whatever form it may take or label it has. See 41 West's Words and Phrases, Tax; Taxation, p. 167, 235 seq. We hold the Cooley definition to be the one contemplated by the authors of the Wyoming Constitution in §§ 1 and 2. It makes no difference that the legislature elects to cause its deposit into a special coal tax revenue account. See § 39-227.10. We are obligated to slash through the underbrush that has grown into the Act and related legislation. Its ingenious subtlety requires great care in analysis. The fact that the tax collected goes into a special account of the general fund has no constitutional implications. It still remains a tax subject to constitutional restrictions, which cannot be avoided by accounting procedures. Nor is it of any significance that the coal tax levied by § 39-227.1 is a new excise tax, that is to say, a tax not theretofore levied. Section 2, Article XVI, makes no distinction as to old taxes and new taxes. It is money belonging to the treasury of the State, regardless of what it might be titled for book-keeping purposes.
As applied to the State, we conclude and hold that § 2, Article XVI, in its use of the term "taxes" includes every sort, in whatever form the legislature elects to take them.
We are genuinely troubled by the so-called "moral obligation" provisions of the Act. The clear provisions of § 2, Article XVI, prohibit the legislature from in any fashion incurring any debt in excess of current taxes unless approved by a vote of the people.
*1127 Yet, with the knowledge of that constitutional provision, the legislature provides in § 9-839(d):
"To assure the continued operation and solvency of the authority for carrying out the public purposes of this act [§§ 9-826 to 9-848], there may be appropriated, at the discretion of the legislature, and paid to the authority for deposit in each debt service reserve fund such sum, if any, as shall be certified by the chairman of the authority to the governor as necessary to restore such fund or funds to an amount equal to the maximum amount of principal and interest maturing and becoming due in the next succeeding year on the bonds of the authority then outstanding and secured by such fund or funds. The chairman of the authority shall annually, on or before August 31 in each year, make and deliver to the governor his certificate stating the sum, if any, required to restore each such fund to the amount aforesaid, and the sum or sums so certified, if any, may, at the discretion of the legislature, be appropriated and paid to the authority during the then current state fiscal year."
The legislature thus tools up the Authority to prepare itself for funds it expects may be necessary but cannot require future legislatures to appropriate. The legislature, after this effort to perpetuate the financial stability of the Authority, then covers itself by requiring that any bond issued by the Authority bear the certificate of the state treasurer that it "is not an indebtedness of the state." Section 9-836(b).
Such provisions are usually inserted at the suggestion of bond counsel because apparently it is believed they improve the salability of the bonds. Gibson v. Smith, 1975, 20 Or. App. 264, 531 P.2d 724, footnote 3, reh. den., review denied.[31] One of the arguments against such a moral obligation provision is that such a make-up expression is that a bond dealer would point to the statute as an assurance to potential buyers of the bonds, that if the source of payment should prove insufficient, a future legislature would come to the rescue to prevent or overcome a default. As noted in the concurring opinion to In re Constitutionality of ORS 456.720, supra, footnote 31, as a practical matter, a state legislature will not permit a default because of its effect on the State's credit rating. We believe there is even more of an argument against such a provision, which we shall get to after some preliminary discussion.
Section 9-839 was discussed at some length in the Interim Report and Recommendations of the Legislative Select Committee, to which document we have previously referred. The Select Committee Report states that paragraph (d) of § 9-839 is a device that "gives additional assurance to the bondholder on bond repayment", "to back up the bonds". To implement the use of this device, it is provided by the same paragraph that the Authority must certify its needs to restore the fund to the governor with the expectation, of course, that such an appropriation be requested of the legislature, to be allowed at its discretion.
What alarms us is the obvious pressure the enacting legislature is putting on future legislatures. The basic intent and purpose of § 2, Article XVI, Wyoming Constitution, limiting incurrence of state debt beyond the current year's taxes is to prohibit the legislature from binding subsequent legislatures to make appropriations of money in subsequent fiscal years. We are satisfied that subsequent legislatures are, in fact, left with no discretion.
This view is bolstered by the interpretation placed upon § 9-839 by the Authority *1128 itself in its General Bond Resolutions for all the projects we have before us. The resolutions, by their terms, are the contracts between the bondholders, the Authority and the State. They are referred to, as such, on the face of the bonds, actually to be issued.
Section 505 of all resolutions provides as follows:
"(2) Debt Service Reserve Account. (A) The Authority shall pay into the Debt Service Reserve Account (i) such portion of the proceeds of the sale of each Series of Bonds, if any, as shall be provided by the Supplemental Resolution authorizing the issuance thereof, (ii) all moneys paid to the Authority pursuant to Section 9-839(d) of the Act which have been appropriated and made available by the State for the purpose of restoring the Debt Service Reserve Account to the Debt Service Reserve Requirement and (iii) any other moneys which may be made available to the Authority for the purposes of the Debt Service Reserve Account from any other source or sources." (Emphasis added.)
Then, in § 710 of the mortgage purchase resolution and § 717 of the loans to lenders and civic and water projects resolutions:
"(2) In order to assure the maintenance of the Debt Service Reserve Account in an amount equal to the Debt Service Reserve Requirement and in compliance with the requirements of the Act, the Chairman of the Authority shall annually, on or before August 31, make and deliver to the Governor of the State his certificate stating the sum, if any, required to restore the Debt Service Reserve Account to the amount of the Debt Service Reserve Requirement and a copy of such certificate shall be promptly delivered by the Chairman to the Trustee. All moneys received by the Authority from the State pursuant to any such certification in accordance with the provisions of Section 9-839(d) of the Act, shall be deposited in the Debt Service Reserve Account, as required by subsection 2 of Section 505." (Emphasis added.)
Section 803 of all resolutions provides that it shall be an act of default:
"(C) If the Authority shall fail or refuse to comply with the provisions of Section 9-839(d) of the Act, or such amounts as shall be certified by the Chairman of the Authority to the Governor pursuant to the provisions of the Act shall not be appropriated and paid to the Authority prior to the termination of the then current State fiscal year." (Emphasis added.)
It is obvious then that the bondholders would not consider it discretionary on the part of the legislature to appropriate sufficient funds to restore the reserve contemplated by § 9-839(d).
The legislature has authorized the Authority to enter into such an agreement by § 9-836(b), in pertinent part, as follows:
"(b) All bonds issued by the authority may be payable solely out of the revenues and receipts derived from the lease, mortgage or sale by the authority of its projects or any thereof, or any of its receipts, incomes or revenues, all as may be designated in the proceedings of the authority under which the bonds are authorized. * * *" (Emphasis added.)
The resolution excerpts are the proceedings referred to.
To then further tie down the Authority and the State, there is promised on the face of the bond the full faith and credit of the State, in the following words of pledge and agreement:
"Pursuant to Section 9-843 of the Act, the Authority hereby includes as part of the contract with holders of Bonds the following pledge and agreement of the State: The State pledges to and agrees with the holders of any Bonds that the State will not limit or alter the rights vested in the Authority to fulfill the terms of any agreements made with holders thereof or in any way impair the rights and remedies of such holders until the Bonds, together with the interest *1129 thereon, with interest on any unpaid installments of interest, and all costs and expenses in connection with any action or proceeding by or on behalf of such holders, are fully met and discharged."
By adroit draftsmanship, the 43rd legislature, probably unknowingly, has permitted itself to obligate, by contract, future legislatures to pay off bonds in a "manner" prohibited by § 2, Article XVI.
The expression on the bonds and in the Act that the bonds are "not an indebtedness of the state" does not reflect their true status. The other compelling provisions of the Act contradict and overwhelm such a conclusion. Any discretion of the legislature has been lost in the shuffle.
The provisions of the Act, creating what is referred to as a "moral obligation" are misleading to those of the public who would invest their money. If they were not intended as an attraction, a sales gimmick, and if they had no significance, there would be no reason for their existence as a part of the Act. We question the ethics of a government utilizing such a merchandising technique. Principles of justice and honesty fundamentally apply to individuals, municipalities, states and the Nation alike, and should be applied alike. Henning v. City of Casper, 1936, 50 Wyo. 1, 57 P.2d 1264, reh. den. 62 P.2d 304. It is well said in 63 Am.Jur.2d Public Funds, § 70, pp. 457-458: 457-458:
"The essence of a moral obligation is that it arises out of a state of facts appealing to a universal sense of justice and fairness, even though upon such facts no legally enforceable claim can be based. A `moral obligation' justifying the enactment of a statute providing for the payment of compensation in a case in which no legal liability exists on the part of the state or its subdivisions is such an obligation as would be recognized by men with a keen sense of honor and with a real desire to act fairly and equitably without compulsion of law. However, it is generally recognized that a moral obligation is more than a mere desire to do charity or to appropriate money in acknowledgment of a gratitude. It is an obligation which, though lacking any foundation cognizable in law, springs from a sense of justice and equity which an honorable person would entertain, but not from a mere sense of doing benevolence or charity."
Furthermore, it is an intrusion on the spirit of the Wyoming Constitution. A court will not ignore the general spirit of the Constitution or its jurisdiction. Schaefer v. Thomson, D.C.Wyo., 1964, 240 F. Supp. 247.[32] Section 2, Article XVI, prohibits the legislature from in "any manner" binding its successors. The moral obligation provision, § 9-839(d), is contrary to the spirit of § 2 and is a nullity in that it does in a "manner" attempt to impose some pressure, by furnishing the procedure to do so, and provide a lever for others to exert pressure upon some future legislature of the state to make payment on a debt it has authorized its own legislatively-constructed instrumentality to create and for which it attempts to impose future responsibility.
We have reached our conclusions with respect to the "moral obligation" provisions of the Act, with a full realization that some other states have considered innocuous a moral obligation provision in revenue bond legislation. In re Interrogatories By Colorado State Senate (Senate Resolution No. 13) Concerning House Bill No. 1247, Fifty-first General Assembly, Colo. 1977, 566 P.2d 350; California Housing Finance Agency v. Elliott, 1976, 17 Cal.3d 575, 131 Cal. Rptr. 361, 551 P.2d 1193; Massachusetts Housing Finance Agency v. New England Merchants National Bank of Boston, 1969, 356 Mass. 202, 249 N.E.2d 599; Wein v. City of New York, 1975, 36 N.Y.2d 610, 370 N.Y.S.2d 550, 331 N.E.2d 514; Martin v. North Carolina *1130 Housing Corporation, 1970, 277 N.C. 29, 175 S.E.2d 665; Johnson v. Pennsylvania Housing Finance Authority, 1973, 453 Pa. 329, 309 A.2d 528; State ex rel. West Virginia Housing Development Fund v. Waterhouse, W. Va. 1974, 212 S.E.2d 724. Even so, those cases only hold such provisions harmless in that they do not create a debt and the bond and statutory statements that the bonds are not debts of the state preclude any claim of debt. To us, it looks like "buyer beware."
We have examined all those cases. We find different constitutional language as well as different statutory provisions, none of which reflect the extraordinary intent expressed in the Act and associated statutes before us, to assist and contribute future tax revenues to the payment of revenue bonds. In doing so, the legislature, on behalf of the State has assumed their payment as enforceable legal obligations. We do not hold that future legislatures may not, under proper legislative acts, then passed, appropriate funds to a public purpose in aid of true political subdivisions and to alleviate critical housing shortages in impacted areas. We only hold that the Act and related enactments, we here consider, create debts of the State beyond a current year's taxes. However, there may be a caveat in a most important sentence in Laverents, appearing at 67 Wyo. at 205, 217 P.2d at 883: "* * * Not being a debt, no tax can be collected to pay them [the bonds]. Nor can any other general income be diverted to that purpose. * * *"
All the cases we have studied on that subject hold that such moral make-up provisions have no legal binding effect. However, in State ex rel. Hall v. Taylor, supra, it was found that under the facts of that case, such a provision was so strong that the political effect was to create a debt of the State. We believe the same effect arises from the Wyoming Act.[33]
We shall next explore whether the plan of the Authority, under § 9-830(u), (v) and (w), to purchase secured and insured loans is violative of the Wyoming Constitution. Those provisions included in the powers of the Authority are as follows:
"Except as otherwise limited by this act [§§ 9-826 to 9-848], the authority may:
* * * * * *
"(u) Purchase loans from mortgage lenders, including construction loans or advances, secured by first mortgage liens on residential real property in the state and insured by governmental or private mortgage insurance;
"(v) Make loans to mortgage lenders under terms and conditions requiring the proceeds thereof to be used by such mortgage lenders for the making of new mortgages on residential real property, all subject to the provisions of W.S. 9-832;
"(w) Enter into loan servicing agreements with any bank, savings and loan or other financial institution in this state pursuant to which such financial institution will service mortgage loans for the authority at such reasonable fees as the parties may agree;"
Supplementing those provisions is § 9-832, which to a considerable extent lays down detailed guidelines and restrictions upon purchase of mortgages and loans to lenders for close control of those activities.
Referring once again to the Interim Report and Recommendations of the Legislative Select Committee, supra, in its explanation of the Act, is included a discussion of § 9-832. With respect to mortgages purchase, the committee, in pertinent part, states:
"* * * The Authority would in effect be assuming the role of a secondary market for mortgages originated and serviced *1131 by existing qualified financial institutions. This would be similar to the secondary market provided by large insurance companies, Fanny May and other sources."
By way of illustrating the power to loan to lenders, the interim report elucidates, in pertinent part, as follows:
"* * * Under the loan to lenders program the Authority is playing a role similar to the Federal Home Loan Bank when it lends funds to a savings and loan association, or when Federal funds are borrowed by banks."
A saving feature of the legislative plan in regard to the mortgage purchase and loan or lenders program is that no state tax money is initially funneled into repayment of bonds as a part of revenue. The Authority obtains its money to fund those activities by issuance of revenue bonds, to be repaid from scheduled mortgage and loan payments. Our conclusion is based upon the premises that no constitutionally-prohibited grant of coal excise tax money is made by the farm loan board to the Authority, a special reserve fund under § 9-839(b) is not established and the so-called moral obligation provision, § 9-839(d), is stricken and, finally, on the further premise that the Authority is not a political subdivision but rather a state agency or body corporate, operating as a state instrumentality.
We have little reason to question the public purpose of the mortgage purchase and loans to lenders provisions. The legislature made an appropriate finding that:
"* * * It is further declared that a critical shortage of adequate housing exists in the state because of the location and expansion of industries and industrial developments and the lack of funds of private mortgage lending institutions of the state which are available to finance new housing at reasonable rates. * * *"
In a comparable case, Walker v. Alaska State Mortgage Association, Alaska, 1966, 416 P.2d 245, the legislature made a similar finding. The court there held that legislative findings are controlling in absence of a controversy questioning their validity. No factual controversy appears in the record here. The Alaska court did not have before it any questions, such as we have, about the commitment of State tax money to the discharge of bonds issued by a body corporate as a state instrumentality having a separate existence.
In New Jersey Mortgage Finance Agency v. McCrane, 1970, 56 N.J. 414, 267 A.2d 24, the legislature found that New Jersey was experiencing "the lack of funds available to finance housing by private mortgage lending institutions." The agency was established and empowered to raise funds from private investors through sale of tax-exempt bond issues, such as here. The funds were then made available to private lending institutions. The court there held that a public purpose was being served, adequate and sufficient, being a prime consideration in assessing the general health and welfare of the citizenry. However, once again, the New Jersey court was presented no issue concerning involvement of State tax moneys because the bonds were payable solely out of the funds and revenues of the agency. We have examined the entire New Jersey Act, § 17:1B-4, et seq., N.J.S.A., and find not the slightest hint or suggestion that sometime in the future, the legislature might appropriate tax money to feed or establish a reserve for the payment of bonds; the New Jersey Mortgage Finance Agency was entirely on its own.[34]
Speaking only to the mortgage purchase and loans to lenders provisions, as long as no debt in the State is created, as we herein hold, there is no lending of the credit of the State in violation of § 6, Article XVI, Wyoming Constitution, providing as follows:

*1132 "Neither the state nor any county, city, township, town, school district, or any other political sub-division, shall loan or give its credit or make donations to or in aid of any individual, association or corporation, except for necessary support of the poor, nor subscribe to or become the owner of the capital stock of any association or corporation. The state shall not engage in any work of internal improvement unless authorized by a two-thirds vote of the people."
In summary then, we answer or respond to the constitutional questions propounded to us by the district court as follows:
"1. Does W.S. 9-18.20 constitute a continuing appropriation in violation of Article 3, Section 35, Wyoming Constitution?"
We will not answer this question for the reason that there is not before us any project of the Authority demonstrating its application. It is the last section of the Wyoming Joint Powers Act, §§ 9-18.13 to 9-18.20, and authorizes the farm loan board to loan the permanent funds of the State to joint powers boards. We do not find that any such a loan is involved in this case and therefore no issue to decide. We only note, however, that § 9-834(a)(ii), stating that loans to a "municipality," as defined by the Act, may be pledged wholly or in part, to the Authority for the payment of bonds.
"2. Does W.S. 24-125 violate Article 16, Sections 1 and 2, Wyoming Constitution, because an agency of the State is creating a debt in excess of taxes?"
It is unconstitutionally applied when the loan terms from the Authority require that the debt be paid from future excise taxes to be collected beyond the current year in which the loan is made. See the explanation in the body of this opinion.
"3. Does W.S. 24-125 violate Article 2, Section 1, Wyoming Constitution, because it constitutes an improper delegation of a legislative power?"
Because the answer to question No. 2 is dispositive, we will not answer this question.
"4. Whether the loan authority contained in W.S. 9-18.20 is a subject separate from the subject of the Joint Powers Act and thus invalid under Wyoming Constitution Article 3, Section 34?"
Since the loan authority is not applied, we will not answer this question.
"5. Does Section 10, Chapter 202, Session Laws of Wyoming 1975, [this section appropriated funds for the administration of the Authority] violate Article 3, Section 34, Wyoming Constitution because said Section is not related to ordinary expenses of the legislative, executive and judicial departments of the State, and should be enacted by separate bill embracing one subject?"
No. There is no constitutional limitation on the creation of a separate body corporate to, as a state instrumentality, perform governmental functions having a public purpose. With that right goes the implied authority to lend financial support for purely administrative purposes. In re Advisory Opinion, 1968, 380 Mich. 554, 158 N.W.2d 416, 429-430.
"6. Does Chapter 188, Session Laws of Wyoming, 1975, violate Article 16, Section [sic] 1, 2, 3, 4 and 5, Wyoming Constitution by providing a means to exceed debt limitations?"
We only find the Act unconstitutional in the particulars noted in the body of the opinion, in the absence of an election. It is not wholly unconstitutional. Any of its unconstitutional features are because of §§ 1 and 2, Article XVI, Wyoming Constitution. Sections 3, 4 and 5 are not involved since the Authority under the terms of the Act is not and cannot be a political subdivision. *1133 Section 39-227.10(e) is unconstitutional insofar as it authorizes future excise revenues to be pledged indirectly and actually used for the satisfaction of revenue bond obligations created by the Authority.
"7. Does Chapter 188, Session Laws of Wyoming, 1975, violate Article 13, Section 3, Wyoming Constitution by reason of the fact that it permits municipal corporations to borrow money for reasons other than for public purposes?"
Section 3, Article XIII, does not prohibit a municipal corporation from borrowing within the applicable limitations of Article XVI, Wyoming Constitution. The legislature, however, may impose additional restrictions on the exercise of the power. Whipps v. Town of Greybull, 1941, 56 Wyo. 355, 109 P.2d 805, 146 A.L.R. 596. The Act, by its own clear language, does not authorize municipal corporations to borrow for reasons other than public purposes.
"8. Does W.S. 9-834(b), 9-830 and 9-835 violate Wyoming Constitution, Article 3, Section 37, because it delegates to the Authority the power to interfere with municipal monies?"
No. We agree with the Authority that the Authority is a statewide governmental instrumentality, which comports with our conclusion that it is not a political subdivision. It is designed, though having some unconstitutional features, to meet the economic impact upon the entire state and its people. It is patterned to perform a function not within the capabilities of a municipality. It does not interfere with that which is within the powers of a municipality. Such a plan is not within the prohibition of § 37, Article III. War Memorial Hospital of District No. 1, Park County v. Board of County Com'rs of County of Park, 1955, 73 Wyo. 371, 279 P.2d 472. We can see no usurping of any local function. We note that § 9-833(a)(i) provides that the Authority acts only when any "needed facility and services cannot be adequately furnished by conventional planning or financing sources." The Authority has no power to tax. We see nothing in the Act permitting the Authority to move into a community and perform any function against the will of the people there residing. See Frank v. City of Cody, supra.
"9. Does Chapter 188, Session Laws of Wyoming, 1975, violate Article 16, Section 6, Wyoming Constitution because it constitutes lending of the public credit for a private purpose?"
No, provided no debt is created in the State beyond the current year's taxes. Powers v. City of Cheyenne, supra, confirming Uhls v. State ex rel. City of Cheyenne, supra. Any private benefit would then be purely incidental and not within constitutional prohibitions. State v. Snyder, 1923, 29 Wyo. 199, 212 P. 771. No private purpose seems involved. If the State were permitted to guarantee payment of the bonds, we might be confronted with different considerations.
"10. Does Chapter 188, Session Laws of Wyoming, 1975 violate Article 3, Section 36 of the Wyoming Constitution because it permits appropriations for charitable, industrial, educational or benevolent purposes to a person, corporation or committee not under the absolute control of the State?"
Because of our holdings that no appropriated tax funds pledged beyond the current year's taxes of the State can go into a special fund to pay off the bonds, § 3, Article III, has no application, under the facts of this case.
"11. Does Chapter 188, Session Laws of Wyoming, 1975, violate Article 2, Section 1, Wyoming Constitution because it constitutes an improper delegation of legislative powers?"
We will not consider this question because none of the parties have adequately briefed the issue of delegation of *1134 powers under this particular Section and Article of the Wyoming Constitution, having reference to a division of powers and providing as follows:
"The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted."
In the absence of cogent argument and authority, we will not ponder a constitutional question. Constitutional questions are too important to be answered by this court at random and should not be answered unless fully presented. Tharp v. Unemployment Compensation Commission, 1942, 57 Wyo. 486, 121 P.2d 172.
"12. Does W.S. 9-839(b) and (c), insofar as (c) relates to the special reserve fund, violate Article 16, Section 2, Wyoming Constitution by reason of the fact that upon the establishment of a special reserve fund, the State of Wyoming becomes obligated to deposit monies into the fund from excise taxes which may not yet have been collected thereby constituting the creation of a debt in excess of taxes?"
Yes. See body of opinion.
"13. Does the creation of a joint powers board under Wyoming Statute [sic] 9-18.13 through 9-18.20 and the issuance of debt by such a board without an election violate Article 16, Sections 3, 4 and 5, which constitute the county, municipal and school district debt limitations?" (Emphasis by the district court.)
We will not respond to this question in the absence of the joint powers board involved as an indispensable party to this action. The controversy cannot be finally settled in the absence of the party most intimately affected. American Beryllium & Oil Corporation v. Chase, Wyo. 1967, 425 P.2d 66. While we are unable to answer the question in this case, it has been answered in Frank v. City of Cody, supra.
"14. Does Chapter 188, Session Laws of Wyoming, 1975, and Sections 9-844, 9-840, W.S., 1957, as amended, which permits [sic] the appointment of trustees for bond holders violate Article 3, Section 37 of the Wyoming Constitution prohibiting the legislature from delegating to any special commissioner, private corporation or association any power to make, supervise or interfere with any municipal improvements, money, property or effects of the performance of any municipal functions?"
No cogent and authoritative argument having been presented on this question, we will not decide it. Tharp v. Unemployment Compensation Commission, supra.
The state treasurer appeals from many constitutional questions decided by the district court and not reserved, but has either abandoned any contest or they have been considered and decided in our disposition of this case or it is unnecessary that we decide them. We do appreciate the energy, sincerity and professional competence with which counsel have gone about presenting this case for our consideration.
The concepts of the Act and related legislation need not go for naught. The legislature can, by proper modification, reconstruct the Act and related legislation to bring them within constitutional limitations, keeping in mind that the purpose underlying § 2, Article XVI, in providing that any proposition for the creation of a debt in excess of taxes for the current year be submitted for a "vote of the people and by them approved," was to permit the citizens of the state to have a voice in a matter which could increase their tax burden. Neither we nor the legislature can avoid that expression of public will. The plan and concept of the Act along with related legislation can go forward if propositions to create debt are submitted for approval by a vote of the people.
It has not been seriously contended nor do we hold that the Act and its companion legislation are not formulated to serve a public purpose and can be considered *1135 praiseworthy. However laudable the program might be, that will not validate unconstitutional means. May v. City of Laramie, 1942, 58 Wyo. 240, 266, 131 P.2d 300, 309. If the people of the State, by adopting §§ 1 and 2, Article XVI, have committed themselves to a mistaken policy, the only remedy is an amendment, by constitutional methods, of that instrument. Grand Island and Northern Wyoming Railroad Company v. Baker, 1896, 6 Wyo. 369, 45 P. 494, 34 L.R.A. 835, 71 Am.St.Rep. 926. Even though "conventional * * * financing sources" may be inadequate to meet the problem, unconstitutional expedients may not be substituted. The exigency of a situation cannot override constitutional safeguards.
Consistent with the reasoning of our opinion, we reverse the statutory interpretations of the district court, concluding and holding that bonds issued by the Authority to the extent noted in the opinion are not indebtedness of the State of Wyoming; that a special fund fed by the tax imposed by § 39-227.1(f), through operation of § 39-227.10(e), is a proper application of the "special fund" doctrine; that the Authority is a political subdivision of the State of Wyoming and not an agency of the State and any other holding of the district court inconsistent herewith.
As far as possible and except as noted, we have answered the constitutional questions propounded.
GUTHRIE, Chief Justice, concurring.
It is with extreme personal reluctance that I concur in the opinion of Justice Raper, but find no other alternative after much research and analysis.
This will be a most summary statement, and I shall in no manner attempt to cite authority, but will only attempt to make clear the reasons for my concurrence in this disposal. I suggest that, reduced to its lowest common denominator, to hold otherwise it would be necessary for this writer to engage in semantic sophistry to destroy the common and obvious meanings of two words which appear in Article 16, § 2, Wyoming Constitution, and to impute thereto a meaning I find it impossible to believe was ascribed to them by the writers thereof.
These words are "taxes" and "debt." I can comfortably rest upon the majority opinion that holds a tax is a tax whether it be ad valorem or excise as long as it is extracted from a taxpayer. It is impossible for this writer to view the use of this all-inclusive word employed by the writers of the Constitution as meaning anything but all such taxes as may be levied for the support of the state government, and particularly it does not contain an invitation to courts to amend that section by inserting the words "except excise taxes."
It is proper to concede that many appellate courts have diluted the meaning of the word "debt" in a constitutional sense. The genesis of this approach rests, in my view, in its application to the true self-liquidating special fund cases. This has been used as a prop to justify such results, and the writer concedes that it rests rather solidly in fact in such cases, although it may even be suggested that the logical application is suspect, even under the self-liquidating fund cases. The writer finds it hard to say that a debt is not a debt because the holder thereof is limited to certain sources for recovery, and fully sympathizes with the old truism which appears in Mayor and City Council of Baltimore v. Gill, 31 Md. 375, 388 (1869), when it is said that "to raise money on a pledge is to borrow it." In my view, Section 2 is not only a limitation of debt but a limitation placed upon each legislature so that it may not bind its successor. This is the general rule as set out in 75 Am.Jur.2d, States, Territories, and Dependencies, § 50, p. 449. However, if bonds were issued hereunder they would be debts binding upon the State, at least so far as "the monies derived or to be derived from the excise tax" and the pledge contained in § 9-843, W.S. 1957, 1975 Cum.Supp., and the agreement "with the holders of any bonds issued under this act, that the state will not limit or alter the rights hereby vested in the authority to fulfill the terms of any agreements made with the holders thereof, or in *1136 any way impair the rights and remedies of such holders." If bonds are issued thereunder they become debts binding upon the State because the legislature, if it deemed it to be in the public interest, may contract for a term longer than the life of the session, State of Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 58 S.Ct. 443, 82 L.Ed. 685, 113 A.L.R. 1482, rehearing denied 303 U.S. 667, 58 S.Ct. 641, 82 L.Ed. 1123  this upon the theory of impairment of contract. The effect and application thereof, if this law is approved and bonds issued, would be a real obligation more binding than that of a moral obligation, at least to the extent of the mineral taxes pledged.
Additionally, it has been said the mere use of a taxing authority for debt-service payment creates a constitutional "debt," Secretary of Transportation v. Mancuso, 278 Md. 81, 359 A.2d 79, 83-84.
ROSE, Justice, dissenting, with whom McCLINTOCK, Justice, joins.
It is with grave concern and regret that I write this dissenting opinion  concern for the State of Wyoming as it seeks to play its unique and important part in the Nation's energy dilemma  and regret that this court, when the opportunity presented itself in circumstances where  in my judgment  the legal vehicles were available, was unable to affirmatively respond to the legislature's efforts to solve the minerals-impact problem.
The minerals-industry is causing massive and localized financial and physical discomfiture for Wyoming and its people. This is not because it intends this  but because this is the natural result of its being here where the minerals and energy sources are and doing what it must do.
The legislature envisioned a way to alleviate these problems through a financial arrangement calling for the industry causing the problem to respond fairly to its solving in those areas where the problems in fact exist.
There was a path along which we could have lawfully traveled leading to a result which would have upheld the constitutionality of the Wyoming Community Development Act. It is my purpose here to point out that path which, in my opinion, this court should have taken.
I will speak precisely to the principal issue before the court, which is the constitutional-debt-limit question. It is my judgment that, under the facts of this case, when tested against the appropriate Wyoming constitutional provisions, reliance upon the excise taxes assigned for the repayment of the Community Development Authority's bonds does not and  under the case law of this state  cannot convert such bonds into a "debt" in the constitutional sense of the word. We are here concerned with the constitutional propriety of the Authority's issuance of revenue bonds which are funded, secured and redeemed through two separate excise tax sources:
1. The coal impact excise tax; and
2. The general mineral excise tax.
The coal impact tax is a new tax, levied upon the severing of coal for the specific purpose of providing funds to solve the impact problems brought on by the mining industry and  except to service the Authority's bonds  would not have been enacted. Coal-impact tax money flows from the participating political subdivisions and the State Highway Commission to the Authority, where it is assigned to the retirement of its bonds and discharge of other obligations. The Highway Commission and the political subdivisions receive the coal tax money as direct grants from the State Farm Loan Board. These tax funds, along with other project revenues, are pledged to the Authority and received into its debt service account  which is the primary source of repayment to the Authority's bondholders.
The general mineral excise tax predated the legislation creating the Authority, but was increased for the specific purpose of supplying funds to the Authority (S.L. of Wyoming 1975, Ch. 125, § 1) so that the mineral-impact problems might be solved. Except to service the Authority's bonds, this increased-tax legislation would not have been enacted. The income accruing *1137 from this tax is deposited in a special reserve fund which may be called upon only when other moneys are needed but unavailable to discharge the Authority's bond-debt obligations. It, therefore, responds only to "contingency" demands.[1]
The Authority's bonds provide specifically that they are not obligations of the State of Wyoming. I concede it to be the law that such a declaration is not conclusive. I also concede that the legislature could not repeal the taxes or otherwise interfere with the contractual rights of bondholders once the bonds are sold and in the hands of bona fide purchasers.
There are five Wyoming constitutional provisions which play a heavy part in any decision having to do with whether the use of mineral excise taxes for bond repayment purposes converts such bond into a debt in the constitutional context, although Article 16, § 2, is the constitutional provision which gives this court and the parties their principal concern.
As has been noted in the majority opinion, it provides:
"Creation of state debt in excess of taxes for current year.  No debt in excess of the taxes for the current year, shall in any manner be created in the State of Wyoming, unless the proposition to create such debt shall have been submitted to a vote of the people and by them approved; except to suppress insurrection or to provide for the public defense."
Sections 1, 3 and 5 of Article 16 limit the maximum overall debt-incurring capacity of the state, county or municipality to a percentage of "the assessed value of the taxable property," while Sections 2 and 4 of Article 16 limit the yearly debt-incurring capacity to a figure which cannot be in excess of the taxes for the current year. Speaking of these sections, it is my assumption that "debt" and "indebtedness" mean the same thing in all of them. I know of no case law or constitutional interpretation which in any manner inhibits this assumption[2], and I will discuss the importance of this proposition later in this opinion.
In deciding whether or not reliance on the excise taxes with which we are here concerned does or does not structure a constitutionally prohibited debt in violation of Article 16, § 2, these following questions may appropriately be asked.
(1) Is the Authority such an entity as is capable of incurring a debt of the State of Wyoming? If the answer to this is in the negative, then Article 16, § 2, is not violated because this constitutional provision only speaks of a state debt.

Section 9-829(a), W.S. 1957, 1975 Cum. Supp., provides:
"There is hereby created the Wyoming community development authority. The authority is a body corporate and politic, constituting a political subdivision of the state operated solely for the public benefit... ." [Emphasis supplied]
The above-quoted language is persuasive evidence of the intention of the Wyoming Legislature to create a body corporate having an identity separate and distinct from that of the State. I believe this was done and that the majority's reasoning to the effect that the legislature failed to accomplish its purpose is strained  unrealistic and in impertinent disregard of the rule which requires us to uphold the statute if that is at all possible. We said in DeHerrera v. Herrera, Wyo., 565 P.2d 479, 482, citing Grand Rapids Co. v. Grand Hotel & Opera House Co., 11 Wyo. 128, 70 P. 838, reh. den. 11 Wyo. 128, 72 P. 687 (1902):
"... It is contrary to reason to ascribe to a statute a meaning that will nullify its operation, if capable of any other interpretation... ."
An examination of the Authority's powers lends support to the position I take in this regard. Such powers include the ability to sue and be sued, to make and execute contracts, to acquire, own, hold, improve, sell, *1138 sign, exchange, transfer, convey, lease, mortgage, dispose of and encumber real and personal property, to lend money, and to borrow money and issue its negotiable bonds. (§ 9-830, W.S. 1957, 1975 Cum. Supp.) These powers are the hallmark of a body corporate created and endowed with the right to incur obligations in its own name and to be responsible for them.[3]
But the majority disagrees and holds that the entity is capable of creating such debts as would expose the general credit of the State, thereby violating the debt limitations of Article 16, § 2, supra. Even though I do not agree with the majority about the nature of the entity and believe it to be a body corporate, and thus incapable of incurring State indebtedness, I here assume, arguendo, and only for purposes of getting to the main issue, that the Authority has State-debt-incurring capabilities. The next question, therefore, is:
(2) Absent a vote of the people, will the assignment of mineral excise taxes to a fund to be utilized for the purpose of securing and retiring revenue bonds, create such a debt in the constitutional context as will result in a violation of Article 16, § 2?
The majority finds that such a use of the excise tax would create such a prohibited debt. I disagree with this conclusion.
Parenthetically, it will readily be noticed that the character of the entity with which we are here concerned  whether it be a political subdivision, body corporate or state agency  is of no relevance to my position on question numbered 2 above because it matters not at all what nature of animal the Authority is if, in assigning the excise taxes to the funding of revenue bonds, such a use of excise taxes is incapable of structuring a constitutional indebtedness. More vividly, the irrelevant question would be  what sort of an entity is it that did not create a debt?

THE SPECIAL-FUND DOCTRINE
Without belaboring the point, it can be unequivocally said that we are, in this state, committed to the special-fund doctrine. We have approved this method of public financing where the fund for debt retirement is created from the facility financed (Laverents v. City of Cheyenne, 67 Wyo. 187, 217 P.2d 877;) where the income from the fund is constitutionally authorized (Arnold v. Bond, 47 Wyo. 236, 34 P.2d 28); and where excise tax funds are to be contingently utilized to participate in the discharge of a bonded indebtedness incurred for the purpose of financing a municipal sewer system. Banner v. City of Laramie, 74 Wyo. 429, 289 P.2d 922.

Laverents v. City of Cheyenne

(What is a constitutional debt?)
In Laverents, supra, the constitutional efficacy of municipal revenue sewage disposal plant bonds secured only by the income from the facility was before the court *1139 where it was charged that the scheme was in violation of Article 16, § 2. We said that there would be no constitutionally prohibited debt if the city could not be called upon to pay the creditors should the facility-assessment income be insufficient for bond-redemption purposes. We said, also, that a further restriction upon the special-fund doctrine was that the bond creditor should be compelled to look to the fund alone and not to the general credit of the political entity issuing them. We further held that moral obligations do not create debts in the constitutional sense.[4] In my judgment, *1140 each of these injunctions is fully complied with under the Wyoming Community Development Authority Act in its utilization of excise taxes for special-fund financing.

Arnold v. Bond

(Loans secured by constitutionally authorized special funds do not constitute a constitutional debt.)
In Arnold v. Bond, supra, we held that a special fund could be created from the interest accruing from the University Permanent Land Fund. We said that such a special fund could properly be assigned to the payment of a debt owing to the federal government by reason of moneys borrowed to build the Fine Arts Building on the campus of the University of Wyoming without violating the requirements of Article 16, § 2. This we held to be permissible, on the theory that the use of the interest from the permanent land fund was constitutionally authorized for such purpose.

Banner v. City of Laramie

(Bonds funded by excise taxes do not structure a constitutionally prohibited debt.)
It is with the majority's interpretation of Banner, supra, that I have my principal concern, disagreement  and disappointment!! The majority says that Banner
"... is distinguishable and not in point for several reasons, probably the most important of which is that it involved local financing by a political subdivision and made no reference to or explanation of §§ 1 and 2, Article XVI, Wyoming Constitution, pertaining to prohibitions against State indebtedness..."
Even a cursory reading of Banner gives denial to this conclusion. In Banner, the City of Laramie proposed to issue revenue bonds to finance the construction of a drainage system, which bonds were secured by cigarette and gasoline tax funds and without which the bonds were not salable. The enabling statute was challenged as being in violation of Article 16, §§ 4 and 5, of the Wyoming Constitution. These sections of Article 16 impose upon municipalities the same requirements that §§ 1 and 2 impose upon the State. I would observe that the Banner experience indicates that the gasoline tax has a natural relationship with the project financed, together with some constitutional authority for such utilization. The assignment of the gasoline tax to the indicated purpose is thus comparable to the constitutionally authorized interest utilization of Arnold v. Bond. The cigarette tax, however, had no such project relationship and no such constitutional sanction. Under the ordinance, it was contemplated that when and if the facility assessment income proved inadequate to retire the bonds, then the cigarette and gasoline taxes would come to the fund's rescue.
In Banner, we decided that the debt obligations in question, secured by the proceeds of excise taxes, were not "debts" as contemplated by the Wyoming Constitution and hence were not subject to the strictures of Article 16. The decision was based upon the holding that (a) contingent liabilities are not within the purview of Article 16 debt limitations and (b) the relevant constitutional provisions apply only to the use of property taxes and not to the use of excise taxes.
In the matter before the court here, we have a new excise tax (the coal impact tax) and an existing excise tax which has been increased by the legislature (the mineral excise tax), both of which are imposed on the very segment of the industrial community which has created the impact problems sought to be solved by the Wyoming Development Authority Act. These taxes, being intimately related to the problem to which they are, by this Act, assigned to solve, are far more restrictive and consistent with special-fund doctrinaire than any relationship that the Banner cigarette tax might have had with the City of Laramie's drainage system.

*1141 A CONTINGENT LIABILITY DOES NOT STRUCTURE A CONSTITUTIONAL DEBT (MINERAL EXCISE TAX)
As Banner is applied to the case at hand, the following is, I think, beyond dispute: Banner stands as authority for the creation and utilization of the mineral excise tax fund to secure the Authority's bonds, because a contingency fund is thereby created which, like the Banner revolving gasoline and cigarette tax fund, could be called upon only when other sources of revenue fail.
The Banner court said:
"It has been held in numerous cases that a contingent liability does not constitute a debt within the constitutional provisions... ."
We noted in Banner (289 P.2d at 927-928) that our holding was consistent with a long line of cases including American Co. v. City of Lakeport, 220 Cal. 548, 32 P.2d 622, 626, where the court noted that
"[t]he rule that the inhibitions of the constitutional debt limit do not apply to contingent obligations has long been settled in this state."
The court also cited with approval, Hansen v. City of Havre, 112 Mont. 207, 114 P.2d 1053; and Comfort v. City of Tacoma, 142 Wash. 249, 252 P.2d 929.

ONLY THE USE OF PROPERTY TAXES CREATES CONSTITUTIONAL DEBTS (COAL EXCISE TAX)
The contingency authority of Banner does not, however, reach to solve the constitutional-debt issue raised by the coal tax and with which the majority expresses its greatest concern. The coal tax funds, under the facts here, and as authorized by the Community Development Authority Act, are utilized as direct grants to the Highway Commission and the subdivisions issuing bonds for purchase by the Authority. This money becomes a part of the committed security for the loan or bond purchase given and made by the Authority to its borrower or bond-debtor.
The question then is  can the State of Wyoming  in the face of Article 16, § 2  exact an excise tax which directly funds and secures the Authority's revenue bonds? In my judgment, Banner v. City of Laramie also settles this issue. In the Banner decision, we felt it necessary to bolster the court's position with respect to the part that excise taxes play within the confines of the special-fund doctrine. To do this, we cited with approval the following:
"In annotation, 100 A.L.R. 900, 901, it is stated:
"`Although the cases are not entirely in accord and dissenting opinions have been frequent, it has generally been held that an obligation payable exclusively from a special fund created by the imposition of fees, penalties, or excise taxes, and for the payment of which the general credit of the state or municipality is not pledged and resort may not be had to property taxation, is not a debt within the meaning of constitutional debt limitations.'" [Emphasis supplied]
Oregon and Florida have constitutional-debt provisions similar to our §§ 2 and 4, with the exception that their provisions refer to a specific amount which may not be exceeded, while ours refer to "taxes for the current year." In Oregon, new excise taxes  unrelated to the object of their levy  obtained for a specific purpose, may be credited to a special fund to be used as security for the redemption of certificates of indebtedness (Moses v. Meier, 148 Or. 185, 35 P.2d 981), even though an unrelated, pre-existing fund may not be utilized for such purposes. Terry v. Multnomah County, 27 Or. App. 15, 554 P.2d 1017. In Florida, any new or pre-existing excise tax source may be used for such purposes. State v. Tampa Sports Authority, Fla., 188 So.2d 795.
The purpose in setting forth these constructions of state constitutional debt limitations in the realm of excise taxation is not to suggest that they represent the universally accepted rule, but rather to lend support for the principles embraced by this court in Banner, supra. Therefore  for me  Banner  as applied to this case  stands for these two propositions:

*1142 1. Since a sum payable upon a contingency cannot structure a constitutional debt, it follows that the funding of the Authority's bonds with mineral excise taxes which can only be called upon when other sources are inadequate (and which may never be called upon) is not constitutionally prohibited.
2. Since the coal tax is an excise tax assigned to a special fund for the payment of bonds sold to solve the mineral-impact problem, and since the credit of the State of Wyoming is not exposed and, in case of default, the bondholders are required to seek redress solely from the fund  the obligation thereby created is not a debt in the constitutional sense of the word. Banner and Laverents, supra.
The conclusion embraced by No. 2 above is more sure-footedly reached with the acceptance of the proposition that Article 16 of the Wyoming Constitution only applies to the use of property  and not excise taxes. Banner, supra. The Banner opinion, incorporating the "debt" definitions of Laverents (Note 4), made it clear that Article 16 limitations on indebtedness apply only to the use of property taxes. We said:
"It may be noted that under Article 16, Section 5 of the constitution of Wyoming, the limitation there prescribed is according to the last preceding general assessment. In State ex rel. Capitol Addition Bldg. Comm. v. Connelly, 39 N.M. 312, 46 P.2d 1097, 100 A.L.R. 878, the court said that a debt contemplated by the constitutional limitation was one for the payment of which the general faith and credit of the state or municipality was pledged, and to retire which the levy of a general property tax rather than an excise tax was contemplated, in view of the constitutional provisions limiting the indebtedness to a percentage of the assessed valuation of all property as shown by the last preceding general assessment. This holding was approved in the case of Stone v. City of Hobbs, 54 N.M. 237, 220 P.2d 704, in which case the revolving fund was created out of gasoline taxes collected by the city. The statute providing for this was upheld as valid. The case cites Calerdine v. Freiberg, 129 Ohio St. 453, 195 N.W. 854, 858." 289 P.2d at 928. [Emphasis supplied]
The court, in Capitol Addition Bldg. Comm. v. Connelly, supra, further held:
"Certainly, when the Constitution framers in section 8 limited the amount of any such debt as they had in mind to 1 per centum of the assessed valuation of all property subject to taxation in the state, `as shown by the preceding general assessment,' or when in sections 10 and 12 they enjoined payment of a property tax during the preceding year as a condition of the right to vote, they must have conceived that said assessment bore some relationship to the debt. Could the thought have been other than this, that such assessment roll and the property there listed would be resorted to from year to year by the general taxing power as the source of funds for repayment of the debt so created?..." 46 P.2d at 1101. [Emphasis supplied][5]
It should be noted that while Section 5 (and Sections 1 and 3) make reference to "property," Section 4 (and Section 2) do not. However, we held in Banner that both Sections 4 and 5 were not violated through the use of excise taxes to secure a special-improvement fund principally financed through facility assessments. This holding is consistent with the rule that constitutional provisions such as these should be read in pari materia. See Powers v. City of Cheyenne, *1143 Wyo., 435 P.2d 448; Uhls v. State ex rel. City of Cheyenne, Wyo., 429 P.2d 74; and Laverents, supra.

WHAT DID THE CONSTITUTIONAL CONVENTION INTEND?
In order to further buttress the holding of Banner to the effect that Article 16 contemplates only the use of property taxes and not the use of excise taxes  we need to consider the problem within the framework of the intention of the authors of the Constitution. Did they contemplate that reliance upon any type of tax would create a constitutional debt, or did they contemplate that only a resort to general property taxation would have this effect?
It is my judgment that the intendment was the latter, and thus the use of the coal excise tax funds for the purposes assigned under the Wyoming Community Development Act is constitutional and not repugnant to Article 16, § 2.
In states where constitutional-debt-limitation statutes contain the "assessed valuation" language (such as Sections 1, 3 and 5), the courts have held the use of the tax which will incur the prohibited debt is the use of a real property tax  just as we did in Banner, supra. See, State v. Connelly, supra, and Briggs v. Greenville County, 137 S.C. 288, 135 S.E. 153. Contra, State ex rel. Diederichs v. State Highway Commission, 89 Mont. 205, 296 P.2d 1033, and State v. Martin, 62 Wash.2d 645, 384 P.2d 833. There is a split of authority upon this question, but in those states having constitutional indebtedness provisions such as ours, the better-reasoned view seems to be that only the use of property and not excise taxes are contemplated as being capable of structuring a constitutional indebtedness.
In pursuit of our inquiry, we must take into account the fact that the terms "indebtedness" and "debt," as they appear in §§ 1, 2, 3, 4 and 5 of Article 16, would seem to mean the same thing throughout these various provisions. State v. Connelly, supra Note 2. In Banner, we said the term "indebtedness" contained in Article 16, § 5, did not contemplate a promise to repay revenue bonds out of fees, penalties, or excise taxes. If we assume that the only distinction between §§ 5, 3 and 1 (indebtedness in excess of a percentage of the assessed valuation of taxable property) and §§ 4 and 2 (debt in excess of taxes for the current year), is that the former provisions merely refer to the maximum overall indebtedness, while the latter refer to the maximum yearly indebtedness, then logically the term "debt" contained in Article 16, § 2, likewise does not contemplate a promise to repay revenue bonds out of fees, penalties, or excise taxes. This is so because "debt" and "indebtedness" are used in all five sections in the same context.
All of the debt provisions of the originally proposed constitutional sections contemplated the creation of debts which relied, for payment, on property taxes alone.[6] Creation of debts by the state, and by the *1144 cities and towns, required thereunder the passage of legislation requiring the levy of a property tax as the sole source of payment for the obligations incurred. Elections by payers of property taxes were in some instances required. These various provisions were rejected, but their substance remained a part of the provisions enacted: (1) Reference is still made to the valuation of taxable property; and (2) the distinction between aggregate and yearly debts still is recognized.
It is no answer to say that the word "taxes," in Article 16, § 2, is not preceded by the word "property," and, therefore, must refer to a reliance on any tax. Taxation, *1145 throughout Article 16, must be taken as referring to property taxation. Otherwise, the reference to "taxable property" and the singular distinction of aggregate versus yearly indebtedness would be without meaning.

THE RESTRICTED EXCISE-TAX-CONCEPT
I would say, with some emphasis, that I recognize the dangers inherent in using excise taxes to secure the payment of revenue bonds for public improvements. It would be, and has effectively been, argued that every time a public improvement is needed which would otherwise create a debt in excess of taxes for the current year, the legislature need only pass an excise tax to fund a revenue-bond-borrowing scheme, thereby obviating the need for a vote of the people. This  goes the argument  defeats the protection of such constitutional safeguards as contained in the Article 16 provisions.
But this objection can be avoided by a restricted and accurate utilization of the special-fund doctrine. The evil which so many fear appears only when we ignore the traditional special-fund requirement of relating the purpose of the tax to the thing taxed. A rule contemplating this philosophy should have evolved from this case to the benefit of those who, in the future, have problems related to and solvable by the thing to be taxed  all according to the careful discretion of the legislature.
The special-fund doctrine  whether it contemplates funding exclusively from the facility (Laverents)  from the constitutionally authorized source (Arnold; and the gasoline tax in Banner)  or the coal tax of this case  could and should be put to do the people's work and made to answer their requirements in those situations where the thing to be taxed gives rise to or is in close relationship with the need for excise taxation. The suggested holding in this case would, therefore, say that
new limited excise taxes, imposed upon those taxpayers creating the problem sought to be solved, may be committed to a special fund to be used for the payment of debts incurred to solve those problems, without constituting a debt in the constitutional sense.
This would preclude the use of excise tax moneys to secure the bond issued for the financing of projects which are unrelated to the source of the tax. It would  in fact  have precluded the use of cigarette tax money to fund storm sewer bonds (Banner), but would have allowed the use of the gasoline tax in Banner because of its direct relation to the street and storm sewer facility.
Such a concept would, of course, restrict the related excise tax special fund in a way which would be consistent with the debt concepts of Laverents. That is  the contract between the entity issuing its bonds and the bondholders would have to clearly provide that liability was limited to the fund created by the tax deposits, thereby precluding the exposure of the general credit of the State or political subdivision.
In this case, we have a promise that a new coal tax and a portion of an additional mineral severance tax will be directly or contingently available for the payment of Authority bondholders. Neither of these commitments falls within the parameters of constitutional debt  as defined by this court in Laverents. (See Note 4)
Here, the State has specifically rejected any and all obligations to in any manner be responsible for the Authority's indebtedness. The only promise is that the State will continue the taxes and deposit the income according to statutory agreement with the bondholders as long as there are bonds outstanding and the source of the tax available. The bondholders' sole remedy (in case of default) is an action against the special funds created thereby, and they have no call upon the general credit of the State of Wyoming. The State makes no promise that it will make up any deficits out of the State's existing general resources, and there is no promise that the State will levy a general tax, property or excise, to make up such deficits. In fact  *1146 any such possibility is specifically rejected when, on the face of the bond, the potential bond purchaser is noticed that the State will not be liable in any way under the bond contract.
We have before us a commitment of only a limited, as opposed to a generally levied, excise tax. These taxes are levied only on mineral producers  who are the major source of impact problems. They are specific, limited excise taxes, levied for a specific purpose which is directly related to the objects of that taxation. We are not asked in this case to review the propriety of an obligation which commits general excise tax moneys  those levied on the public in general, such as sales, use, inheritance and cigarette taxes  totally unrelated to projects contemplated and existing as a revenue source for the State prior to the initiating legislation.
We said in Stephenson v. Mitchell, Wyo., 569 P.2d 95, 97:
"... [I]t is well settled that statutes are presumed to be constitutional unless affirmatively shown to be otherwise, and one who would deny the constitutionality of a statute has a heavy burden. The alleged unconstitutionality must be clearly and exactly shown beyond any reasonable doubt. Budd v. Bishop, Wyo. 1975, 543 P.2d 368; State v. Stern, Wyo. 1974, 526 P.2d 344; Johnson v. Schrader, Wyo. 1973, 507 P.2d 814; Constitutional Law, West's Wyoming Digest... ."
The State Constitution is a limitation, not a grant, of power, and, as a result, the legislature possesses all legislative authority except as restricted by the State Constitution, either expressly or by clear implication. State v. Snyder, 29 Wyo. 199, 212 P. 771; and 16 C.J.S. Constitutional Law § 70. Restrictions upon the use of excise tax moneys are not clearly implied by the language of Article 16, § 2, and there are certainly reasonable doubts as to the unconstitutionality of the statutes here considered, especially since we have this court's unrejected case authority (Banner) holding that excise taxes may be used for special-fund financing.
I would say then  in summary  that the history of Article 16 provisions discloses that the constitutional framers were principally concerned with the protection of the general public, and particularly their property, from onerous financial obligations. We broadly embraced that principle in Banner and in Laverents. The use of excise taxes can be justified, within the debt-limitation framework, by reference to the above-mentioned historical setting or by an analysis of the intended parameters of the concept of "debt." There are solid foundations from which the use of limited, new or additional excise taxes  levied for a specific and related purpose  can be justified. In my judgment, the majority commits grievous error  seriously hampering the ability of this State to cope with immediate social and economic problems  by failing to do so in this case.
I would have held the act constitutional. I do not address other reserved questions as a dissenting Justice because the constitutional debt-limitation problem seems to be the most important issue and the only one which, under the majority opinion, actually prevents the Authority from functioning as it was statutorily intended to do.
NOTES
[1] The constitutional questions are as follows:

"1. Does W.S. 9-18.20 constitute a continuing appropriation in violation of Article 3, Section 35, Wyoming Constitution?
"2. Does W.S. 24-125 violate Article 16, Sections 1 and 2, Wyoming Constitution, because an agency of the State is creating a debt in excess of taxes?
"3. Does W.S. 24-125 violate Article 2, Section 1, Wyoming Constitution because it constitutes an improper delegation of a legislative power?
"4. Whether the loan authority contained in W.S. 9-18.20 is a subject separate from the subject of the Joint Powers Act and thus invalid under Wyoming Constitution Article 3, Section 34?
"5. Does Section 10, Chapter 202, Session Laws of Wyoming 1975, violate Article 3, Section 34, Wyoming Constitution because said Section is not related to ordinary expenses of the legislative, executive and judicial departments of the State, and should be enacted by separate bill embracing one subject?
"6. Does Chapter 188, Session Laws of Wyoming, 1975, violate Article 16, Section [sic] 1, 2, 3, 4 and 5, Wyoming Constitution by providing a means to exceed debt limitations?
"7. Does Chapter 188, Session Laws of Wyoming, 1975, violate Article 13, Section 3, Wyoming Constitution by reason of the fact that it permits municipal corporations to borrow money for reasons other than for public purposes?
"8. Does W.S. 9-834(b), 9-830 and 9-835 violate Wyoming Constitution, Article 3, Section 37, because it delegates to the Authority the power to interfere with municipal monies?
"9. Does Chapter 188, Session Laws of Wyoming, 1975, violate Article 16, Section 6, Wyoming Constitution because it constitutes lending of the public credit for a private purpose?
"10. Does Chapter 188, Session Laws of Wyoming, 1975, violate Article 3, Section 36 of the Wyoming Constitution because it permits appropriations for charitable, industrial, educational or benevolent purposes to a person, corporation or committee not under the absolute control of the State?
"11. Does Chapter 188, Session Laws of Wyoming, 1975, violate Article 2, Section 1, Wyoming Constitution because it constitutes an improper delegation of legislative powers?
"12. Does W.S. 9-839(b) and (c), insofar as (c) relates to the special reserve fund, violate Article 16, Section 2, Wyoming Constitution by reason of the fact that upon the establishment of a special reserve fund, the State of Wyoming becomes obligated to deposit monies into the fund from excise taxes which may not yet have been collected thereby constituting the creation of a debt in excess of taxes?
"13. Does the creation of a joint powers board under Wyoming Statute [sic] 9-18.13 through 9-18.20 and the issuance of debt by such a board without an election violate Article 16, Sections 3, 4 and 5, which constitute the county, municipal and school district debt limitations? (Emphasis theirs.) "14. Does Chapter 188, Session Laws of Wyoming, 1975, and Sections 9-844, 9-840, W.S., 1957, as amended which permits [sic] the appointment of trustees for bond holders violate Article 3, Section 37 of the Wyoming Constitution prohibiting the legislature from delegating to any special commissioner, private corporation or association any power to make, supervise or interfere with any municipal improvements, money, property or effects of the performance of any municipal functions?"
[2] The following definitions appear in § 9-828 of the Act:

"(m) `State agency' means any officer, department, board, commission, bureau, division, public corporation, agency or instrumentality of the state;
"(n) `Municipality' means any county, city, town, school district, hospital district, fire protection district, sewer district, water district or other political subdivision of the state, now existing or hereafter created."
[3] Section 9-18.14 defines "agencies" to be counties, municipal corporations, school districts, community college districts and special districts.
[4] Section 9-834(a)(ii) provides that a joint powers board, falling within the definition of a municipality, may pledge to the Authority to secure any loan it may obtain from the latter, "Loans, grants or contributions to the municipality, if any, conditional or unconditional, from the federal government, the state or any other source." (Emphasis added.)
[5] The constitutional portion referred to is that set aside by Article XV, § 19, Wyoming Constitution, as follows:

"The Legislature shall provide by law for an excise tax on the privilege of severing or extracting minerals, of one and one-half percent (1 1/2%) on the value of the gross product extracted. The minerals subject to such excise tax shall be coal, petroleum, natural gas, oil shale, and such other minerals as may be designated by the Legislature. Such tax shall be in addition to any other excise, severance or ad valorem tax. The proceeds from such tax shall be deposited in the Permanent Wyoming Mineral Trust Fund, which fund shall remain inviolate. The monies in the fund shall be invested as prescribed by the Legislature and all income from fund investments shall be deposited by the State Treasurer in the general fund on an annual basis. The Legislature may also specify by law, conditions and terms under which monies in the fund may be loaned to political subdivisions of the state."
[6] Section 39-227.1(f) provides:

"(f) In addition to the other taxes provided by law, there shall be a severance tax upon the privilege of extracting or producing coal in the state of Wyoming of a percentage of the value of the coal produced according to the following schedule:
"(i) For coal produced in the calendar year 1974, a tax of four tenths of one percent (0.4%) of the value of the coal produced;
"(ii) For coal produced in the calendar year 1975, a tax of eight tenths of one percent (0.8%) of the value of the coal produced;
"(iii) For coal produced in the calendar year 1976, a tax of one and two tenths percent (1.2%) of the value of the coal produced;
"(iv) For coal produced in the calendar year 1977, a tax of one and six tenths percent (1.6%) of the value of the coal produced;
"(v) For coal produced in the calendar year 1978 and all subsequent years until the expiration of this tax, a tax of two percent (2%) of the value of the coal produced.
"(f) The tax levied in subsection (f) of this section shall expire on January 1 next following the year in which the taxes collected pursuant to subsection (f) total one hundred twenty million dollars ($120,000,000.00)."
[7] Section 24-125 provides as follows:

"The Wyoming state highway commission, a public instrumentality of the state of Wyoming, may borrow money from the Wyoming community development authority. Such borrowing shall be evidenced by a special obligation loan or loans bearing interest at a rate or rates not exceeding ten percent (10%) per annum and at the discretion of the Wyoming state highway commission, with the approval of the Wyoming farm loan board, may be payable from and secured by a pledge of revenues received under the provisions of W.S. 39-227.1(f) and administered pursuant to W.S. 39-227.10(c), (d), (e) and (f). Any such special obligation loan shall not constitute a debt nor an indebtedness within the meaning of any constitutional or statutory debt limitations. The proceeds of each special obligation loan shall be used for the purpose of constructing or otherwise acquiring highway facilities which become necessary by reason of the location and expansion of mineral extractive industries and other industrial developments in the state." (Emphasis added.)
[8] Section 9-830(n), in outlining the powers of the Authority, provides:

"(n) Lend money to any municipality or state agency on such terms and conditions as the authority deems advisable;"
See also § 24-125, supra, note 7.
[9] Section 9-830(u) provides:

"(u) Purchase loans from mortgage lenders, including construction loans or advances, secured by first mortgage liens on residential real property in the state and insured by governmental or private mortgage insurance;"
See also § 9-832, setting out requirements with respect to purchase of mortgages.
[10] Section 9-830(v), in setting out powers of the Authority, provides:

"(v) Make loans to mortgage lenders under terms and conditions requiring the proceeds thereof to be used by such mortgage lenders for the making of new mortgages on residential real property, all subject to the provisions of W.S. 9-832."
See also § 9-832, setting out requirements with respect to loans to lenders.
[11] Section 9-836(b), in pertinent part, provides that:

"* * * Any bond or obligation for the payment of money shall bear a certificate endorsed thereon by the state treasurer that the same is issued pursuant to law and is not an indebtedness of the state. * * *"
As a matter of interest at this point, § 8, Article XVI, Wyoming Constitution, provides in part:
"No bond or evidence of indebtedness of the state shall be valid unless the same shall have endorsed thereon a certificate signed by the auditor and secretary of state that the bond or evidence of debt is issued pursuant to law and is within the debt limit. * * *"
[12] Section 9-21 provides:

"(a) For the purpose of this act [§ 9-21], `agency' means any office, department, board, commission, institution or other organizational unit of the executive branch of state government.
"(b) Each state agency shall, at the time its budget request (as required by section 9-276.18:63 of the statutes) is submitted to the department of administration and fiscal control, accompany such request with a written report of its condition, activities, objectives and programs covering the previous fiscal period:
"(i) The report shall be in a standard format developed by the department of administration and fiscal control, in conjunction with the agency and the legislative service office, and notice of such requirements of format shall be forwarded to each agency no later than the 15th day of July of each budget period as required by section 9-276.18:62 of the statutes;
"(ii) The report shall contain a detail of the fiscal affairs of the reporting agency including receipts and expenditures;
"(iii) The report shall include recommendations for improving that agency's programs;
"(iv) Upon the receipt of all agency reports, the department of administration and fiscal control shall compile and index the information into a single compendium report in a style and manner that will facilitate its use by the legislature and the governor. The department of administration and fiscal control shall in no manner alter or amend that information received for compilation without written direction to do so from the agency submitting the original report. Any information contained in the report of any agency to the department of administration and fiscal control is open and public and shall be available to any citizen upon request;
"(v) The compendium report shall be submitted to each legislature along with the state budget document. The copies of the compendium report shall be furnished in the manner required to the state library and the legislative service office."
[13] It is interesting to note that §§ 9-276.18:65 and 9-276.18:66 have been omitted. Those sections would permit the governor to "approve, disapprove, alter or revise the estimates" and hold public hearings on the estimates and require attendance of agency representatives. However, § 9-276.18:67 would still permit the governor to make recommendations with respect to the budget. We relate the omissions to the last sentence of § 9-847(b):

"Nothing contained herein shall be construed as impairing or affecting any pledge of special funds of the authority to the payment of the revenue bonds herein authorized."
The "special funds" of the Authority include tax revenues received from the state. Section 9-839(b) and (c).
[14] Township organization in the state has never been implemented. See § 4, Article XII, Wyoming Constitution.
[15] Charles N. Potter, Laramie County, Journals and Debates of the Constitutional Convention, Wyoming, 1889, p. 5.
[16] Every law must be presumed constitutional, with all reasonable doubt resolved in its favor. State v. Stern, Wyo. 1974, 526 P.2d 344; Associated Enterprises, Inc. v. Toltec Watershed Improvement District, Wyo. 1971, 490 P.2d 1069, probable jurisdiction noted 407 U.S. 908, 92 S.Ct. 2432, 32 L.Ed.2d 681, affirmed 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675.
[17] The historical information in the preceding paragraph is digested from William J. Shultz, "Limitations on State and Local Borrowing Powers," 181 The Annals of the American Academy of Political and Social Science, 1935, pp. 118-124. For further historical background, see footnote 7, Frank v. City of Cody, Wyo. 1977, 572 P.2d 1106.
[18] 1 Wyoming Bluebook, Wyoming State Archives and Historical Department, p. 560.
[19] Section 1, Article XVIII, provides in pertinent part:

"The State of Wyoming hereby agrees to accept the grants of land heretofore made, or that may hereafter be made by the United States to the state, for educational purposes, for public buildings and institutions and for other objects, and donations of money with the conditions and limitations that may be imposed by the act or acts of congress, making such grants or donations. * * *" (Emphasis added.)
[20] Section 15, Article VII, provides:

"The establishment of the University of Wyoming is hereby confirmed, and said institution, with its several departments, is hereby declared to be the University of the State of Wyoming. All lands which have been heretofore granted or which may be granted hereafter by congress unto the university as such, or in aid of the instruction to be given in any of its departments, with all other grants, donations, or devises for said university, or for any of its departments, shall vest in said university, and be exclusively used for the purposes for which they were granted, donated or devised. The said lands may be leased on terms approved by the land commissioners, but may not be sold on terms not approved by congress."
[21] The Authority frequently alludes to Uhls v. State ex rel. City of Cheyenne, supra. That case was decided when this court consisted of four members. There was an even split, in part, which resulted in an automatic affirmance and there could be no majority opinion. Its value as authority is only so good as what life might have been breathed into it by subsequent opinions, in other cases. While there were opinions, designated as dissenting opinions, there was no majority as such. The so-called dissent did not adopt the views of the "prevailing" opinion. In Reed v. City of Cheyenne, Wyo. 1967, 429 P.2d 69, a companion case to Uhls, there was again a split, two judges only concurring in the result but not the prevailing opinion. In Powers v. City of Cheyenne, Wyo. 1967, 435 P.2d 448, reh. den. 436 P.2d 961, there was a majority opinion but as far as any definitive approach to public purpose was concerned, there was no approval of statements made in that regard, only that there was an insufficient showing that a public purpose was not present. Powers gave life to Uhls on the question of delegation of powers. On the question of debt limitation, Uhls was given life in that it approved the special-fund concept enunciated in Laverents v. City of Cheyenne, 1950, 67 Wyo. 187, 217 P.2d 877. Other questions answered in Uhls, not pertinent here, were also given value. This is therefore a case which must be cited with caution. See also, footnote, Frank v. City of Cody, supra, where the problem of Uhls was discussed in a slightly different tenor.
[22] See footnote 11.
[23] While not suggested as in the offing in this case, the Wyoming farm loan board could conceivably, if the statute were valid, make a grant directly to the Authority if the Authority were in fact a political subdivision, which it is not. Section 39-227.10 provides for grants from revenues "derived or to be derived" from the coal tax, § 39-227.1(f) to "any county, city, town, sewer district, water district or other political subdivision." (Emphasis added.)
[24] Established as provided in § 9-839(a).
[25] The Interim Report uses the following language in its explanation:

"Should general revenues of the Authority be insufficient to meet the annual debt service requirements of its bonds, then it is proposed that deficiencies be made up out of this special reserve fund, the purpose being to preserve the integrity of the debt service reserve fund. Such an arrangement is significant because any impairment of the debt service reserve fund triggers a request by the Director and in turn by the Governor that the Legislature exercise its moral obligation to make up the deficiency. The moral obligation procedures are described more fully below. There are a number of other points that should be understood regarding this proposal for a special reserve fund made up from part of severance tax proceeds. First, its primary purpose it [sic] to insure against the eventuality that a call will ever be made upon the Legislature to exercise its moral obligation. Obviously, the more protective support that is given to the debt service reserve fund in the absence of the state's full faith and credit, the more marketable the bonds will be. This again translates to lower interest rates for the consumer which is another obvious benefit of the special reserve fund. Once the required balance in the special reserve fund is reached no further call on the severance tax proceeds is made and that portion pledged to this special fund then automatically reverts to the general fund. Only in the event that the prescribed balance is compromised will severance tax funds be once again diverted to this special reserve fund. It should also be understood that any reserve fund moneys will be invested to produce income and it is provided in this paragraph that the earned interest be used to defray the Authority's operations cost.
"As a practical matter, provision is made for a contingent earmarking of a portion of severance tax proceeds to be used in funding a special reserve fund. This special reserve fund would be used only if calculated revenues did not meet debt service requirements. If revenues do meet or exceed debt service requirements as we would expect they would, then moneys in the special reserve fund will never be needed and, ultimately, would be returned to the general fund. In this event the maximum amount of moneys that could ever be `locked up' in this special reserve fund would be an amount equal to one year debt service of the Authority's outstanding bonds."
[26] The Washington court by that case overturned its previous approval of a tax-fed special fund, after, observing the State's experience and realizing the wisdom of the State's constitutional prohibitions against debt.
[27] Followed in Secretary of Transportation v. Mancuso, 1976, 278 Md. 81, 359 A.2d 79, and Scroggs v. Kansas City, Mo. 1973, 499 S.W.2d 500.
[28] 1976 Annual Report, Department of Revenue and Taxation, Ad Valorem Division, p. 105.
[29] Volume II, Annual Report, General Government, State of Wyoming, July 1, 1975, through June 30, 1976, p. 9 of the section entitled "Revenue and Taxation."
[30] 1976 Annual Report, Department of Revenue and Taxation, Ad Valorem Tax Division, p. 106.
[31] That case held a provision like § 9-839(d) unconstitutional because it was made mandatory on future legislatures to keep the reserve fund full by appropriation, rather than discretionary. Following amendment by the legislature, a discretionary provision was approved. See In re Constitutionality of ORS 456.720, 1975, 272 Or. 398, 537 P.2d 542.
[32] Three-judge district court on constitutional questions, involving the Wyoming Constitution; Opinion by Pickett, Circuit Judge, 10 Cir.
[33] In Huber v. Groff, Mont. 1976, 558 P.2d 1124, appears a review of various other cases examining the moral implications of such a provision. There is no need for us to cite again the cases there cataloged. Some leave the provisions as merely an expression of hope of what future legislatures will do. Others strike them as nullities. We prefer the latter course.
[34] See also those cases we have cited in the body of this opinion wherein courts held the moral obligation provision created no debt.
[1] "Contingency" becomes important within the context of Banner v. City of Laramie, 74 Wyo. 429, 289 P.2d 922.
[2] State v. Connelly, 39 N.M. 312, 46 P.2d 1097.
[3] Where financial obligations are concerned, the courts of this state have long held that separate and distinct body corporates are responsible for their own obligations. In Arnold v. Bond, 47 Wyo. 236, 34 P.2d 28, the court considered whether an obligation incurred by the trustees of the University of Wyoming, a body corporate with authority to borrow money and to pledge income from the University Permanent Land Fund, was in fact a debt of the State. The court quoted with approval from State v. Regents of University of New Mexico, 32 N.M. 428, 258 P. 571, 572, the following:

"`... How it can be said that this will be an obligation of the state, we cannot understand. This is simply a contract of the University to pay out of a designated fund when received. It is no more an obligation of the state than would be the obligation to pay the salaries of the University faculty. The mere fact that the University is the creature of the state and one of its instrumentalities to carry out its governmental functions is not controlling. The state has given the University certain property rights and has authorized it to make use of the same in a certain manner. This the University is proposing to do, and we can see no objection to the same.'" 34 P.2d at 32.
The court went on to hold that the University was responsible for its own contractual obligations  the bonds  and that the State was not responsible and consequently no debt of the State was created within the constitutional debt limitations.
[4] In Laverents, supra, the author of this court's opinion, the eminent former Chief Justice Blume, defined the nature of the "debt" which will be prohibited by Article 16, § 2, and therefore unacceptable unless voted on by the people. He said, in quoting with approval from Baker v. Carter, 165 Okl. 116, 25 P.2d 747:

"`... [S]o far as the special fund doctrine is concerned, the majority rule as set forth in the case of Garrett v. Swanton, 216 Cal. 220, 13 P.2d 725, announces the correct rule that a limitation upon state or municipal indebtedness is not violated by an obligation which is payable out of a special fund, if the state or municipality is not liable to pay the same out of its general fund should the special fund prove to be insufficient and the transaction by which the indebtedness is incurred cannot in any event deplete the resources of the state or the municipality.'" 67 Wyo. at 202, 217 P.2d at 881.
While the majority opinion here says that a state debt in violation of Article 16, § 2, is created whether or not the creditor is compelled to look to the fund alone, we said in Laverents that it was a further restriction upon the doctrine that the creditor must be compelled to look to the fund alone. We said:
"There are limitations, it is true, to the doctrine relating to special funds or revenue bonds. It is not sufficient that such fund is created but the creditor must be compelled to look to such fund alone. And so it is said in 38 Am.Juris. 150: `It follows that there are at least two well-settled limitations or exceptions to the "special fund" doctrine. In the first place, it is well established that an indebtedness or liability is incurred where, by the terms of the transaction, a municipality is obligated directly or indirectly to maintain or feed the special fund from general or other revenues in addition to those arising from the specific improvement contemplated. It also seems to be well settled, as a second limitation to the doctrine, that a municipality incurs an indebtedness or liability where, by the terms of the transaction, the municipality may suffer a loss if the special fund is insufficient to pay the obligation incurred.' . ." 67 Wyo. at 202-203, 217 P.2d at 882.
We went on to say:
"... The corollary of this would seem to be that if the municipality is not obligated to feed the special fund and where, by the terms of the transaction the municipality cannot suffer a loss, then the debt is not one within the contemplation of the Constitution limiting indebtedness... ." 67 Wyo. at 203, 217 P.2d at 882.
We were concerned in Laverents with the definition of such debts as we considered capable of violating the constitution. We said:
"... The term `debt' is variously defined. Thus it is said in 38 Am.Juris. 101: `An indebtedness cannot arise unless there is a legal, equitable, or moral obligation to pay a sum of money to another who occupies the position of creditor and who has a legal or moral right to call upon or constrain the debtor to pay.' ... In the case of Shields v. City of Loveland, 74 Colo. 27, 218 P. 913, 915, it was said: `Plaintiffs in error insist, however, that the revenue bonds constitute a debt, and so the lawful limit is exceeded. We do not think that they amount to a debt within the intent of the Constitution or statute. The definitions of the word "debt" are many, and depend on the context and the general subject with reference to which it is used. 17 C.J. 1371. Its meaning in the sections of the Constitution and statutes now before us must be determined by their purpose, which was to prevent the overburdening of the public and bankruptcy of the municipality. Clearly the revenue bonds are not within that purpose. The public can never be overburdened by that which it is under no obligation to discharge, nor can the city become bankrupt by what it does not have to pay. Nor are these bonds a technical debt. Nothing is my debt unless a judgment for its amount can be recovered against me upon it.' In 38 Am.Juris. 101 it is said that to constitute a debt `there must be imposed a pecuniary liability upon the municipality or a charge against its general credit.' In Interstate Power Co. v. McGregor, 230 Iowa 42, 296 N.W. 770, 146 A.L.R. 315, the court held that to constitute a debt against a municipality there must be an obligation which must be met with its funds or property amounting to a pecuniary liability or a charge against its general credit. In other words, it may be said generally that to constitute a debt within the intendment of the constitutional provision heretofore set out, it must be payable in whole or in part, out of the general resources of the municipality. That would include taxes, and revenue derived from sources other than the system for which the bonds in question are issued. Branigar v. Village of Riverdale, 396 Ill. 534, 72 N.E.2d 201, 207; Warden v. City of Grafton, 115 W. Va. 438, 176 S.E. 706, 707." 67 Wyo. at 203-204, 217 P.2d at 882-883.
[5] The three state cases cited by the appellant (Boswell v. State, 181 Okl. 435, 74 P.2d 940; Curlin v. Wetherby, Ky., 275 S.W.2d 934; and Arizona State Highway Commission v. Nelson, 105 Ariz. 76, 459 P.2d 509) all involve constitutional provisions substantially different than those of Wyoming and New Mexico. Unlike Wyoming or New Mexico, they make no tie-in between the indebtedness and taxable property within the state. Consequently, they are much broader. In fact, it should be noted that the Oklahoma court specifically observed that New Mexico's constitution has been held to have been "designed to apply only to debts contemplating the levy of a general property tax for their retirement." 74 P.2d at 949. (Appellee's brief)
[6] The Journals of the Constitutional Convention reveal the originally proposed provisions:

"Sec. 3. The state shall not contract any debt by loan in any form except to provide for casual deficiencies of revenue, erect public buildings for use of the state, suppress insurrection, defend the state, or in time of war assist in defending the United States; and the amount of the debt contracted in any one year to provide for deficiencies of revenue shall not exceed one-fourth mill on each dollar of valuation of taxable property within the state, and the aggregate amount of such debt shall not at any time exceed three-fourths of a mill on each dollar of said valuation until the valuation shall equal one hundred millions of dollars, and thereafter such debt shall not exceed one hundred thousand dollars, and the debt incurred in any one year for erection of public buildings shall not exceed one-half mill on each dollar of said valuation, and the aggregate amount of such debt shall never at any time exceed the sum of fifty thousand dollars (except as provided in section five of this article) and in all cases the valuation in this section mentioned shall be that of the assessment last preceding the creation of debt.
"Sec. 4. In no case shall any debts above mentioned in this article be created except by a law which shall be irrepealable until the indebtedness therein provided for shall have been fully paid or discharged, such law shall specify the purposes to which the funds so raised shall be applied, and provide for the levy of a tax sufficient to pay the interest on and extinguish the principal of such debt within the time limited by such law for the payment thereof, which in the case of debts contracted for the erection of public buildings and supplying deficiencies of revenue, shall not be less than ten nor more than twenty years, and the funds arising from the collection of any such tax shall not be applied to any other purpose than that provided in the law levying the same, and when the debt thereby created shall be paid or discharged such tax shall cease, and the balance, if any, to the credit of the fund, shall immediately be placed to the credit of the general fund of the state.
"Sec. 5. A debt for the purpose of erecting public buildings may be created by law as provided for in Sec. 4 of this article, not exceeding in the aggregate three mills on each dollar of said valuation; Provided, that before going into effect such law shall be ratified by the vote of a majority of such qualified electors of the state as shall vote thereon at a general election made under such regulations as the general assembly may prescribe.
"Sec. 6. No county shall contract any debt by loan in any form except for the purpose of erecting necessary public buildings, making or repairing public roads and bridges, and such indebtedness contracted in any one year shall not exceed the rates upon the taxable property in such county, following, to-wit: Counties in which the assessed valuation of taxable property shall exceed five millions of dollars, one dollar and fifty cents on each thousand dollars thereof. Counties in which such valuation shall be less than five millions of dollars, three dollars on each thousand dollars thereof. And the aggregate indebtedness of any county for all purposes exclusive of debts contracted before the adoption of this constitution, shall not at any time exceed twice the amount above herein limited, unless when in manner provided by law, the question of incurring such debt shall at a general election be submitted to such of the qualified electors of such county as in the year last preceding such election shall have paid a tax upon property assessed to them in such county and a majority of those voting thereon shall vote in favor of incurring the debt; but the bonds, if any be issued therefor, shall not run less than ten years, and the aggregate amount of debts so contracted shall not at any time exceed twice the rate upon the valuation last herein mentioned; Provided, That this section shall not apply to counties having a valuation of less than one million dollars.
"Sec. 7. No debt by loan in any form shall be contracted by any school district for the purpose of erecting and furnishing school buildings, or purchasing grounds, unless the proposition to create such debt shall first be submitted to such qualified electors of the district as shall have paid a school tax therein in the year next preceding such election, and a majority of those voting thereon shall vote in favor of incurring such debt.
"Sec. 8. No city or town shall contract any debt by loan in any form, except by means of an ordinance, which shall be irrepealable until the indebtedness therein provided for shall have been fully paid or discharged, specifying the purposes to which the funds to be raised shall be applied, and providing for the levy of a tax, not exceeding twelve (12) mills on each dollar of valuation of taxable property within such city or town sufficient to pay the annual interest and extinguish the principal of such debt within fifteen, but not less than ten years from the creation thereof, and such tax, when collected shall be applied only to the purposes in such ordinance specified, until the indebtedness shall be paid or discharged. But no such debt shall be created unless the question of incurring the same shall at a regular election for councilmen, aldermen or officers of such city or town, be submitted to a vote of such qualified electors thereof as shall in the year next preceding, have paid a property tax therein, and a majority of those voting on the question, by ballot deposited in a separate ballot box, shall vote in favor of creating such debt, but the aggregate amount of debts so created, together with the debt existing at the time of such election shall not at any time exceed three per cent of the valuation last aforesaid. Debts contracted for supply water to such city or town are excepted from the operation of this section.
"The valuation in this section mentioned shall be in all cases that of the assessment next preceding the last assessment before the adoption of such ordinance." Journal and Debates of the Constitutional Convention, pp. 206-208. [Emphasis supplied]